LUDWIG FLYGE, Appellant, *v.* RAY FLYNN and GEORGALEE C. FLYNN, His Wife, W. A. DRESSLER and CHARLES ALDABE, Respondents.

No. 3431

February 16, 1946.

166 P. 2d 539.

*John Davidson* and *H. R. Cooke,* both of Reno, for Appellant.

*W. M. Kearney* and *Sidney W. Robinson,* both of Reno, for Respondents.

## OPINION

By the Court, HORSEY, J.:

This case is before us upon the appeal of Ludwig Flyge, the plaintiff in the district court, from the judgment and from the order denying plaintiff's motion for a new trial.

The facts of this case, as disclosed by the evidence contained in the transcript on appeal, are substantially as follows:

On September 11, 1941, respondent, Ray Flynn, as seller, entered into a written contract with the respondent, W. A. Dressler, as buyer, under the terms and provisions of which said Ray Flynn agreed to sell to said W. A. Dressler an undivided one-half interest in and to certain property, used for ranching purposes, and consisting of the land described in said contract, certain appurtenances incident thereto and used in connection therewith, in said contract set forth, and all the improvements upon said land and the ranch equipment then upon said property. The property, an undivided one-half interest in which was agreed to be sold, was located, in part, in Washoe County, Nevada, and, in part, in Sierra County, California, and the other undivided one-half interest therein was owned by Mary Elizabeth Flynn, a minor, for whom the said Ray Flynn was guardian, and for which half interest an agreement of sale dated July 1, 1941, and signed by Ray Flynn, as seller, and agreeing to sell said one-half interest to said W. A. Dressler, as buyer, had been executed.

The said W. A. Dressler, in the contract dated September 11, 1941, had agreed to pay for the interest of the said Ray Flynn $5,500, as follows: $500 cash within two days after confirmation and ratification of the agreement of sale dated July 1, 1941, covering the one-half interest of said Mary Elizabeth Flynn, said minor, by the superior court of Sierra County, California, and by the second judicial district court of the State of

Nevada, in and for the county of Washoe; to assume one half of the outstanding mortgage upon said property, of $5,500, plus interest, held by W. B. Bridgman, of 247 Cheney Street, Reno, Nevada, the accrued interest then being about $20; the balance of the sale price, $2,250, on or before five years after the date of the final court order approving the sale of the said minor's one-half interest in the property, the said $2,250 to draw interest at the rate of five percent per annum, payable semiannually, on July first and January first, each year, and the first interest payment to be due January 1, 1942, the buyer to have the privilege of paying the full balance at any time. (Said contract is plaintiff's exhibit "B").

It appears from the evidence that, previous to the entering into the said contract dated September 11, 1941, and upon said date, the said W. A. Dressler was the occupant of said ranch premises under a certain lease, dated the 20th day of November 1940, to extend for a period of two years, beginning February 1, 1941. (Bill of exceptions, p. 146, also p. 148 et seq., said lease being designated as exhibit 16.)

The said lease contained the following provisions: "It is agreed that the present pumping plant, now upon the premises, may be sold, terms and conditions of sale to be approved by the lessor, and if so sold, the proceeds shall be used to construct a reservoir on the leased property."

■ And it appears, from the testimony of W. A. Dressler, upon the trial in the district court, that, pursuant to the provisions of the lease, he had taken possession of the ranch in December 1940, and had occupied the premises under said lease up to the date of the contract of sale, September 11, 1941, and that he had continued thereafter in such occupancy; and that, "around the last of August, 1941," he removed the Diesel engine and pump from the property, but was not paid for same immediately. The witness, Dressler, was shown a check drawn by Allied Equipment Company, dated September 18, 1941, which he stated was in payment for the engine

and pump he had sold prior to that date (The check was admitted in evidence as defendant's exhibit 15.) The testimony of Dressler, as to the said lease, his occupancy thereunder until he constructively took possession under said agreement of September 11, 1941, and as to his removal of said Diesel engine and pump, pursuant to said provisions of the lease, prior to September 11, 1941, was not contradicted by any evidence at the trial. It may be considered, therefore, as an established fact that the Diesel engine and pump, which, subsequent to September 11, 1941, entered importantly into certain calculations and transactions of the appellant, Flyge, and the respondents, Ray Flynn and Georgalee C. Flynn, and into the instant case, commenced by the said plaintiff, Flyge, against respondents, Ray Flynn and Georgalee C. Flynn, his wife, W. A. Dressler, Bert Allison, and Allied Equipment, Inc., a corporation, on November 19, 1942, upon the apparently mistaken idea that such engine and pump were included in the property belonging to the Flynns, and by the said agreement of September 11, 1941, agreed to be sold to Dressler, and were wrongfully removed by Dressler, were, as a matter of fact, not a part of said premises when said agreement was made, and did not comprise any part of the property thereby agreed to be sold. It follows that, by their removal, Dressler, who acted pursuant to the right and authority vested in him under the above-mentioned lease of November 20, 1940, did not violate his contract with the Flynns, nor commit waste by removing such Diesel engine and pump. From the evidence, and admissions in the pleadings, it is established that on or about October 30, 1941, respondent, Ray Flynn, borrowed from W. M. Kearney, the sum of $600, and executed and delivered his promissory note to said W. M. Kearney, payable July 1, 1942, with interest at eight percent per annum, together with reasonable attorney's fees for collection if not paid at maturity; that, as security for the payment of said indebtedness, the respondent, Ray Flynn, executed and delivered to said Kearney an assignment of all the

Flynns' rights in the said contract entered into September 11, 1941, between the said Ray Flynn, as the seller, and W. A. Dressler, as the buyer, and that said assignment was recorded, at the request of W. M. Kearney, on November 29, 1941, in Volume N of Bonds and Agreements, at page 419, records of Washoe County, Nevada; that the respondent, Ray Flynn, executed and delivered, to said W. M. Kearney, a deed to the said ranch premises, dated October 30, 1941; that the appellant alleged, in the amended complaint herein, that said deed was a deed of trust, which respondents did not admit, but it is sufficiently established that it was given as additional security for such loan of $600. It is admitted that such deed was duly recorded. It is further admitted, in the answer of the respondents, Ray Flynn and Georgalee C. Flynn, to appellant's amended complaint, that, on or about April 6, 1942, the said Flynns repaid the said loan of $600 and $32 interest, to W. M. Kearney, in full discharge of said loan theretofore made to said Ray Flynn by the said Kearney, and that the said W. M. Kearney reassigned to respondent, Ray Flynn, the said contract of purchase dated September 11, 1941, between the said Ray Flynn and W. A. Dressler, and that the said Kearney executed a reconveyance to the said respondent, Ray Flynn, of all rights derived by him under said deed dated October 30, 1941.

It appears from the admissions in the pleadings, and from the evidence, and, in fact, is undisputed, that, on the 6th day of April 1942, respondents, Ray Flynn and Georgalee C. Flynn, his wife, made, executed and delivered to appellant, Ludwig Flyge, a certain promissory note, in writing, dated April 6, 1942, in the principal sum of $900, payable on or before June 4, 1942, with interest at six percent per annum, payable quarterly, in advance, both principal and interest payable only in lawful money of the United States, and containing the other usual provisions, including a promise to pay reasonable attorney's fees for collection, and stating that the payment of the note was secured by an assignment of even

date therewith. (The said note was admitted in evidence at the trial as plaintiff's exhibit "A.") It further appears that, as security for the payment of said note, the said Ray Flynn and Georgalee C. Flynn, respondents, on said 6th day of April 1942, made, executed and delivered to appellant, Ludwig Flyge, an assignment, in writing, which was admitted in evidence at the trial as plaintiff's exhibit "C," and is in words and figures as follows:

"For and in consideration of the sum of One ($1.00) Dollars to us in hand paid, receipt of which is hereby acknowledged, we, the undersigned, Ray Flynn and Georgalee Crider Flynn, my wife, do hereby assign, sell and set over to Ludwig Flyge, as his separate property, all of our right, title and interest in and to that certain agreement of sale dated September 11th, 1941, by and between the undersigned, Ray Flynn, as seller, and W. A. Dressler known as the buyer.

"Said contract of sale was recorded September 13th, 1941, at Page 339, Liber K of Contracts and Agreements, Records of Sierra County, California and also recorded on September 17th, 1941, in Volume N of Bonds and Agreements, Page 351 et seq., Records of Washoe County, Nevada.

"We further assign all of our right, title and interest in and to any and all real and personal property situated on the real property described in the above agreement.

"Dated: At Reno, Washoe County, Nevada, this 6th day of April, 1942."

The dates, offices and books of the records of said instrument sufficiently appear following the certificate of acknowledgment thereto appended.

It is clear from the evidence, and is not disputed, that for several months prior to the execution and delivery of the said note for $900 and the said assignment to Ludwig Flyge, the Flynns had been indebted to said Flyge, principally for rent of the house of his they were occupying. The appellant, Flyge, testified the rental owing him at the time of the assignment was five

months' rental, at $40 per month, a total of $200; that $640 of the amount of the loan was for Mr. Kearney; and $50 was for money that he, Flyge, gave Mrs. Flynn, $10 of said $50 being to pay the power company for electricity, and $40 thereof being for groceries; that in February he had "paid fifteen dollars for oil for the furnace so they would not freeze to death." The trial judge, at that point in the proceedings, remarked that said amounts made $905 which was $5 in excess of the amount of the note. It appears from the pleadings, however, that $632 was the amount paid Kearney. It is undisputed that the note was for value received, and that the Flynns received from appellant, Flyge, on executing the note and assignment, approximately $900.

From the testimony, it appears, and is undisputed, that appellant, Flyge, had, for some time, been insistent upon security for the past due rental, that negotiations had been proceeding for several weeks in regard to the matter, and that Flyge, learning of the contract with Dressler for the sale of the ranch, and the existence of the $600 note to Kearney, and the assignment to Kearney of the Dressler contract, for security, and the execution of the deed of trust to him, proposed to the Flynns that he, Flyge, would advance them the money to pay off the Kearney note, if they would assign to him their interest in the Dressler contract. This was finally agreed upon, and it was agreed that, besides paying off Kearney the $600 and $32 interest, and including the $200 for rental, Flyge would advance to the Flynns enough cash to make the total of $900. So, upon that understanding, the note of $900, payable to Ludwig Flyge and dated April 6, 1942, and the assignment of even date therewith, to secure payment of said note, were executed.

██ It was alleged by the appellant, in his amended complaint, that the appellant loaned to respondent, Ray Flynn, the $632 to pay off the Kearney obligation, on the agreement of Ray Flynn that appellant would be given the same security as that held by Kearney. No evidence was adduced at the trial to that effect. In view

of the fact that, when the note and the assignment were drawn and Kearney was paid off, no paper such as a deed of trust or mortgage were drawn or discussed, it appears that the note and assignment, as prepared and executed, finally evidenced the real agreement of the parties, irrespective of any prior negotiations. And it is too plain for discussion, that any such understanding, not embodied in any instrument in writing and duly recorded, could not bind an innocent purchaser of the property for value and without any actual notice of such understanding.

It is sufficiently proven, by the evidence, that on Good Friday, April 3, 1942, the appellant, Ludwig Flyge, John Davidson and Mrs. Georgalee C. Flynn visited the said ranch. Mrs. Flynn testified that the purpose of the trip was "to see the engine on the property." She further testified as follows: "We looked the property over and saw that the engine had gone, which I did not know, and talked to Mr. Dressler for a few minutes and Mr. Davidson, I believe it was, that day, he ordered him to leave the property for not fulfilling his contract."

Upon being asked, upon direct examination, whether Mr. Flyge was present at that time, the witness answered: "He was with us. I could not say whether he was in hearing distance."

Mrs. Flynn further testified, in substance, that they all drove up to the field, to where the engine was, and Dressler was up there; that, at that time, she did not known anything about the engine being gone; that, after they left, she went, with Mr. Davidson and Flyge, back to Reno, and then went to Mr. Davidson's office. The witness was not sure whether she signed any papers that day, or the next day, "but there was a letter that Mr. Davidson wrote telling them legally, I guess, to leave the property." Mrs. Flynn testified, also, that she went out to the ranch "a couple of times," between April 3, 1942, when the letter was written and July 1, 1942, and one time she was speaking to Mr. Dressler's wife, and told them she would like to know when they were going

to leave, that she would like to move out as soon as possible; that the witness did that at the direction of Mr. Davidson; that the witness finally went out, and took possession of the ranch, the last of July or the first of August.

W. A. Dressler testified as to what occurred at the ranch, April 3, 1942, substantially, that he "was up in the field along the ditch, putting in the dam in the ditch when the three of them came up there, and I don't know, I don't remember just how the conversation started." Then the following questions and answers occurred:

"Q. Mr. Kearney: Who was present when they came to the ditch? A. Mrs. Flynn, Mr. Davidson, and Mr. Flyge.

"Q. Go ahead and state what was said and done at that time. A. I believe Mr. Davidson asked me where the pump was and I told him I sold the pump, and then he told me to get off of the ranch, and I just looked at him—so he kept telling me to get off, and, if I remember right, I told him I didn't think I had to get off; and I don't remember the rest of the conversation, but anyhow they all got in the truck and rode back to the house with me, where their car was.

"Q. And Mr. Flyge was in the field at that time and heard the conversation? A. Yes, right alongside of the truck, and I was sitting in the truck."

Further on, the court asked Mr. Dressler when he actually left the property, and he replied he didn't know the exact date, but it was the last of July or the first of August (1942).

John Davidson, recalled as a witness for the plaintiff, identified a carbon copy of a letter, dated April 3, 1942, addressed to W. A. Dressler, which he (Davidson) wrote to Mr. Dressler on that day, and testified that Flynn requested him to write it, and that the original was sent to Dressler. Mr. Dressler, in his testimony, acknowledged its receipt. Questioned by Mr. Robinson as to whom he was representing when he wrote that letter, Mr. Davidson said he wrote the letter on behalf of Mr.

Flynn, that he was representing him at that time. Asked at what period in this transaction he quit representing Mr. Flynn and commenced to represent Mr. Flyge, Mr. Davidson answered: "I do not recall the exact date when Mr. Flynn and Mrs. Flynn and Mr. Aldabe went into Mr. Kearney's office and he took over the attorneyship for both of them, and that is the time I switched." Mr. Kearney moved that the answer be stricken because assuming something not in evidence and that it was hearsay, and the court ruled that "that particular portion only of the answer may now be stricken." The witness then testified he no longer represented Flynn, that, jointly with Mr. Cooke, he "now" represents Mr. Flyge. The letter dated April 3, 1942, written, as testified, by Mr. Davidson, on behalf of Flynn, and addressed to Dressler, was admitted in evidence as plaintiff's exhibit "D." Said letter, reciting four alleged violations by Dressler of the agreement of September 11, 1941, stated that:

"* * * you may consider this letter as formal notice to the effect that we have declared the contract in default; that unless all payments are made in accordance with the terms of said contract and all covenants set forth in said contract are complied with within thirty days from date hereof, then it will be necessary for you to vacate the premises and relinquish all of your right, title and interest in and to same.

. "The violations of the terms of said agreement are as follows:

"1-. You have failed to pay interest on the balance due in accordance with Section C, Page 2, of said agreement which was due and payable on January 1st, 1942.

"2-. You have failed to pay the taxes in accordance with said agreement.

"3-. You have failed to pay the interest on the first mortgage of $5500.00 held by W. B. Bridgeman of this city which is now past due.

. "4-. You have caused to be removed and sold by you

one diesel engine and pump situated and located on said ranch property."

Mr. Davidson, further on in his testimony upon cross-examination, was interrogated by Mr. Kearney as to what occurred upon the occasion of his visit to the ranch, on April 3, 1942, with Mr. Flyge and Mrs. Flynn, said questions and the witness' answers being, in part, as follows:

"Q. You did go to the ranch with Mr. Flyge on April 3, 1942? A. Yes, and Mrs. Flynn.

"Q. Whom did you see there? A. Mrs. Flynn and I talked to Mr. Dressler.

"Q. Whom did you see there? A. Mrs. Dressler and Mr. Dressler.

"Q. You talked with them, did you not? A. Yes.

"Q. And you ordered him off of the ranch? A. Mrs. Flynn and I—

"Q. Just a minute. A. I did not order him off of the ranch.

"Q. Was he ordered off of the ranch at that time in the presence of Mr. Flyge and Mrs. Flynn? A. I do not think Mr. Flyge was present. I think Mrs. Flynn and I were talking to Mr. Dressler at the time. I think Mr. Flyge stayed in the car and we had to walk way up the field to find Mr. Dressler, and whether or not Mr. Flyge was there at the time I do not know."

From their testimony it is apparent that neither Mrs. Flynn nor Mr. Davidson admitted any certain knowledge of whether or not Mr. Flyge heard, or was where he could have heard, the conversation on April 3, 1942, between Davidson and Dressler, in the field on the ranch, in which Dressler told Davidson he had sold the pump. Dressler said, as above set forth, that Flyge was in the field at that time and heard the conversation—that he was right alongside the truck, "and I" (Dressler) "was sitting in the truck."

On this point, as to whether or not Flyge knew, when he took the assignment dated April 6, 1942, that the

engine and pump had been removed, and concerning which the allegation in paragraph V, subparagraph (c), of plaintiff's original complaint, and the allegations in paragraph V of his amended complaint, are contradictory, Flyge was not permitted by his attorney, Mr. Cooke, to testify.

In the cross-examination of Flyge by Mr. Kearney, Flyge was asked:

"Q. When did you first discover and know that the pump and Diesel engine were not on the Long Valley Ranch, the Flynn Ranch?

"Mr. Cooke: I object to that as not proper cross-examination.

"The Court: That objection must be sustained."

In appellant's (plaintiff's) original complaint, paragraph V, subparagraph (c), it is alleged: "That on or about April 3, 1942 plaintiff gave said defendant written notice of the aforementioned breach as respects the removal and sale by said defendant of the Diesel Engine and Pump and that said breach was not cured within 30 days thereafter, or at all."

But it appears from Mr. Davidson's testimony that the letter of April 3, 1942, containing such notice, was written on behalf of Flynn.

And in subparagraph (c) of paragraph VI of the amended complaint, a different allegation is made, eliminating all reference to the Diesel engine and pump, said allegation being as follows: "(c) That on or about April 3, 1942 written notice of the aforementioned breach as respects the removal and sale by said defendant of the Diesel Engine and Pump was given to said defendant and that said breaches was not cured within 30 days thereafter, or at all."

In paragraph II of appellant's (plaintiff's) amended complaint, referring to the time, September 11, 1941, of the making of the contract between Ray Flynn, as seller, and W. A. Dressler, as buyer for the sale of the ranch, which was admitted in evidence at the trial as plaintiff's

exhibit "B," but was designated in said amended complaint as exhibit "A," the appellant alleged: "* * * that at the time of making said contract, exhibit 'A,' the hereinafter described Diesel Engine and deep well pump were upon said premises and constituted a part of the ranch equipment."

A similar allegation was made in paragraph II of the original complaint.

And in paragraph V of the amended complaint, the appellant (plaintiff) alleged as follows: "* * * that prior to April 6, 1942 plaintiff had knowledge of said ranch equipment being upon said premises and on said April 6, 1942 plaintiff believed said Diesel Engine and deep well pump were then upon the premises; that if plaintiff had then known that said equipment had been removed he would not have consummated said loan transaction; that without said equipment the security offered would be inadequate."

The testimony of Mr. Davidson discloses that, on April 18, 1942, at a time when he was representing Flyge, he, Davidson, on behalf of Flyge, addressed and mailed a letter to Dressler, the body of which is in words and figures as follows:

"I have contacted Mr. Allison of the Allied Equipment Company to whom the pump, the diesel engine and the building located on the ranch you are occupying was sold. He has made repeated attempts to locate you regarding this matter and has handed me a check for $850.00 to cover the amount you received for this pump and other equipment.

"I would suggest that you arrange to take up the entire balance due on this contract without further delay as Mr. Allison is contemplating some criminal action in regard to the unlawful sale of this pump. Either contact me at once or see Mr. Allison regarding this matter."

Said letter was admitted in evidence as defendant's exhibit 5.

On June 30, 1942, Mr. Davidson, as proven by the evidence, addressed another letter to Mr. Dressler, which the latter acknowledged having received about July 4, the body of said letter being as follows:

"Under date of April 3, 1942, I wrote to you and advised you that you were in default of your agreement made with Ray Flynn covering the purchase of the ranch property which you are now occupying. I notified you to the effect that you had removed certain property from the premises consisting of a deep-well pump and a Diesel engine and sold the same to the Allied Equipment Company.

"I have hesitated to start an ejection suit, feeling that possibly you might make some arrangements to take care of this matter without recourse to law, but up to the present writing, I have had no reply from you. I discussed the matter with Mr. Bert Allison last week, and he advised me that you were making the necessary arrangements to pay up the entire balance of this contract.

"This contract has been assigned to Mr. Ludwig Flyge of Reno, Nevada. If you propose and intend to pay up this entire balance within the next few days, I will be glad to cooperate and wait until such time as this can be concluded. However, if this balance on this contract including all interest to date is not received by me for and on behalf of Mr. Flyge on or before the 6th day of July, you may rest assured that legal action will be taken against you and Mr. Allison for the conversion of this property.

"Mr. Allison is willing to pay to us the amount received by him for this equipment, but we must insist on the payment of its full value or else the payment in full of the balance due on the contract at once.

"For your information, there has been no interest paid to and on account of this contract. You may have paid the taxes and the interest on the first mortgage to Mr. Bridgman, but the contract at the present time is in

default, and I propose to enforce the right thereunder unless this matter is settled at once."

It will be noted that the last-mentioned letter related entirely, except as to an item of interest claimed to be due from Dressler, to the alleged wrongful removal of the deep-well pump and Diesel engine, and demands for the full value of same, or else the payment at once of the entire balance to become due on the contract, and giving Dressler only until July 6 to comply, or suffer a suit for unlawful conversion.

Appellant, whom, for convenience, we will designate as plaintiff, on the 19th day of November 1942, brought this action against Ray Flynn and Georgalee C. Flynn, his wife, W. A. Dressler, Bert Allison, and Allied Equipment, Inc., a corporation, in which he prayed judgment:

(a) Against defendants, Ray Flynn and Georgalee C. Flynn, his wife, in the sum of $900, alleged to be due upon a promissory note, with interest thereon at the rate of six percent per annum from April 6, 1942, until paid, together with a reasonable attorney's fee.

(b) Against defendant, W. A. Dressler, adjudging and decreeing that an agreement of sale of one-half interest in the Flynn ranch property, between defendant, Ray Flynn, as seller, and defendant, W. A. Dressler, as buyer, and assigned by defendants Flynn to plaintiff, be terminated; that all rights or interests thereunder of defendant, Dressler, be adjudged forfeited, foreclosed and at an end, and that all moneys already paid thereunder be adjudged to be liquidated damages for said defendant's nonfulfillment of said agreement; that said defendant, Dressler, be ordered and decreed to immediately vacate said premises and relinquish same to plaintiff;

(c) Against defendants, W. A. Dressler, Bert Allison and Allied Equipment, Inc., a corporation, jointly and severally, in the sum of $1,500, plaintiff's alleged share and interest in the value of a deep-well pump and Diesel engine, alleged to have been removed from said ranch

property by defendant, Dressler, and by him sold to defendant, Allied Equipment, Inc., the latter acting in that behalf by defendant, Allison;

(d) Against all of said defendants for costs, and for general relief.

Demurrers to the original complaint were filed, some of which were sustained. An amended complaint was thereupon filed, to which demurrers were interposed. The demurrers of defendants, Bert Allison and Allied Equipment, Inc., a corporation, were sustained without leave to amend, and the action was dismissed as to said defendants with prejudice.

An amendment to the amended complaint was filed, made pursuant to an order bringing in Charles Aldabe as a party defendant, wherein plaintiff prayed that a decree herein include an adjudication that said defendant has no right, title or interest in the real property described in the amended complaint, or that the same is subject and subordinate to the right, title and interest of plaintiff.

The relief prayed for by the amended complaint was the same as in the original complaint, except the paragraph designated as (c), on page 8, was added, same being: "Against all the defendants, that as security for the moneys due him the Court adjudge and decree a lien in favor of plaintiff upon the undivided one-half interest in said premises and that said lien be foreclosed conformably to the usages of equity and said property sold under order of the court and that from the proceeds plaintiff's claim with costs and expenses of sale be first paid and the excess, if any, be paid to said defendants Ray Flynn and Georgalee C. Flynn, or other persons as their interests may appear."

No allegations appear as a basis for this additional prayer, except those in paragraph V, to the effect that the plaintiff loaned the $900 to Flynn upon the agreement that plaintiff would be given the same security as then held by Kearney. In the same paragraph V, however, is the following allegation (hereinbefore quoted in

another connection) : "* * * that prior to April 6, 1942 plaintiff had knowledge of said ranch equipment being upon said premises, and on said April 6, 1942 plaintiff believed said Diesel engine and the deep well pump were then upon the premises; that if plaintiff had then known that said equipment had been removed he would not have consummated said loan transaction; that without said equipment the security offered would be inadequate."

The respondent, Charles Aldabe, answered, and also filed a second amended answer to the amended complaint of the appellant, in which he alleged facts to show that he was a purchaser in good faith and for a valuable consideration, to wit, the sum of $8,000 of the undivided one-half interest in the said property; that he purchased same from the Flynns, and acquired the fee simple title to the property; that he had no actual notice and had no constructive notice of any claim of Flyge to the property, or any interest therein; that the assignment referred to in paragraph IV of plaintiff's amended complaint, as amended, does not affect, and does not purport to affect, real property, by reason of the fact that said assignment is not recorded or indexed as a deed, mortgage, deed of trust, lien, or other instrument affecting, or purporting to affect, real property, and by reason of the fact that such assignment is not such an instrument as is required to be recorded, by the statutes of the State of Nevada.

It was clearly proven at the trial that respondent, Dressler, had not violated the contract made September 11, 1941, in any respect; that, as hereinbefore stated, he had removed and sold the Diesel engine and pump under authority of the ranch lease, dated November 20, 1940 (defendant's exhibit 16), and with the consent of Ray Flynn; that he had paid all interest and taxes in accordance with the proviisons of said contract of September 11, 1941, and that, by the continued harassment, demands for possession, threats of eviction, and wrongful accusations that he had breached said contract, the appellant, Flyge, and the Flynns had themselves

violated said agreement, and Dressler's right thereunder to peaceable possession of said property, which resulted in his leaving and giving up possession of said property, notwithstanding the fact that he had made substantial expenditures thereon.

Dressler left the premises the latter part of July or early August, 1942.

When made a party to this suit by Flyge, Dressler answered and filed a counterclaim, denying any breach of contract on his part, and alleging the said breach of contract by the plaintiff, Flyge, and by plaintiff's assignors, Ray Flynn and Georgalee C. Flynn, by their wrongful accusations that he, Dressler, had broken said contract, by their unlawful demands for possession and threats of eviction, and their wrongful declaration of default on the part of Dressler, and cancellation of said contract, resulting in Dressler leaving and giving up possession of said property.

Dressler prayed for actual damages in the sum of $6,000 ($500 he had paid on the purchase price of said property, $2,500 for work and improvements thereon, and $3,000 for loss of profits on sale).

The trial court found, in substance, that Dressler had not violated the said contract; that the demand of plaintiff, Flyge, for a termination had been accomplished, by Dressler having left the premises, thereby voluntarily acquiescing in the cancellation of said contract; that the said Dressler had the right to remove the Diesel engine and pump; and that plaintiff was entitled to no damages as against Dressler because of their removal and sale.

The trial court further found that Dressler was not entitled to any damages by virtue of his counterclaim, for the reason that he was not evicted by force, nor compelled to yield to the demands of the plaintiff for possession and for the termination of the contract, but voluntarily left the premises and acquiesced in the cancellation of the said contract; but the court allowed Dressler his costs.

The appellant appealed from the judgment in favor

of Dressler, and from the order denying a new trial as to him, but has waived the appeal as to said respondent, Dressler, by the following statement, on pages 1 and 2 of his reply brief to the brief of the respondent, Dressler:

"At the time this suit was commenced in the court below respondent W. A. Dressler was in possession of the property covered by plaintiff's equitable mortgage and claiming purchase thereof. Hence he was made a defendant,—the purpose being of proving, if plaintiff could, that Dressler had breached his contract. But after this action was commenced and before trial thereof, Dressler moved off of the property and relinquished all claims, rights, etc. under said contract.

"It would therefore appear the case was thenceforth moot as to Dressler, except for his counter-claim for damages against the plaintiff Flyge, which claim was wholly denied by the trial court, and except also as to costs already incurred by Dressler being brought in.

"Dressler filed and served his Cost Bill, claiming $10.50. Plaintiff moved that said costs be retaxed, which motion was denied by the trial court. Hence, so far as the respondent Dressler is concerned or interested, the amount involved is the $10.50 costs. We are not disposed to expend further time or labor concerning the said $10.50."

Respondent, Dressler, upon this appeal is not requesting any relief other than the affirmance of the judgment of the trial court dismissing the complaint of the plaintiff and awarding the defendant, Dressler, his costs.

The trial court awarded judgment against defendants (respondents), Ray Flynn and Georgalee C. Flynn, his wife, upon the promissory note made, executed and delivered on April 6, 1942, in the sum of $900, together with interest from April 6, 1942, until paid, at the rate of six percent per annum, together with a reasonable attorney's fee in the sum of $500 and plaintiff's costs and disbursements as against said defendant. That court, in ruling upon the counterclaim of the Flynns

against the plaintiff for an accounting and for a reconveyance to them of certain mineral rights in Oklahoma, held that they had not sufficiently proven their claim for affirmative relief, and denied same.

The trial court decided, and, as a fact found, that respondent, Charles Aldabe, became the owner of the fee simple title to such undivided one-half interest in said ranch property, all appurtenances, and all improvements and equipment thereon, by virtue of its conveyance to the said Charles Aldabe by Ray Flynn and Georgalee Crider Flynn, by a grant, bargain and sale deed, dated November 12, 1942, which said deed is recorded in the office of the county recorder of Sierra County, California, at page 236, liber 40, of deeds, of official records of Sierra County, California, and is also recorded in the office of the county recorder of Washoe County, Nevada, in volume 150 of deeds, at page 535, etc., unencumbered by any equitable mortgage or lien, by virtue of said assignment of April 6, 1942, or otherwise, and awarded to said Charles Aldabe judgment for his costs.

A motion for a new trial was made by the appellant, in the district court, was argued, submitted, and by that court denied.

In his opening brief, on page 3, appellant has stated:

"Plaintiff is dissatisfied with the judgment, principally because the court declined to hold that the title of defendant Charles Aldabe to the real property described in plaintiff's Amended Complaint, as amended, is subject to plaintiff's mortgage lien.

 \* \* \* \* \* \* \*

"Plaintiff makes four basic contentions:

"(a) That the assignment of the agreement for the sale of the ranch property constituted an equitable mortgage of the real property described in said agreement.

"(b) That defendant Charles Aldabe had actual notice of said assignment before purchasing the ranch;

"(c) That defendant Charles Aldabe had constructive

notice of said assignment before purchasing the ranch; and

"(d) That defendant Charles Aldabe had imputed notice of said assignment before purchasing the ranch, because the Washoe County Title Guaranty Company, which had knowledge of said assignment, was the agent of said defendant respecting the condition of the title to the property."

The appellant has interposed ten assignments of error, all of which, except assignments Nos. I, II, VII and X, relate exclusively to the issues between the appellant, Flyge, and respondent, Charles Aldabe.

Insofar as the assignments relating to respondent, W. A. Dressler, are concerned, they have been waived, those thus waived being assignment No. VII, and, in part, assignments Nos. I, II and X. The remaining assignments, Nos. III, IV, V, VI, VIII and IX, and the portions of Nos. I, II and X relating to Aldabe, will depend, of course, for their determination as to their merits, upon the decision of this court as to the propositions involved in appellant's four basic contentions, insofar as it is necessary to determine such contentions.

We will now address ourselves to basic contention (a), which is: "(a) That the assignment of the agreement for the sale of the ranch property constituted an equitable mortgage of the real property described in said agreement."

We agree with the attorneys for appellant that no particular form of instrument, or of language, is essential to create an equitable mortgage on real property.

In 36 Am. Jur., p. 696, it is said: "There are a number of situations wherein instruments which are not effective as mortgages at law will be regarded as such in a court of chancery, which will regard them as binding on the parties as if mortgages in due form had been properly executed. Such instruments are known as equitable mortgages." Citing: King's Heirs v. Thompson, 9 Pet. 204, 9 L. Ed. 102; Ober v. Gallagher, 93 U. S. 199, 23 L. Ed. 829; Pollak v. Millsap, 219 Ala. 273, 122

So. 16, 65 A. L. R. 110; Parry v. Reinertson, 208 Iowa 739, 224 N. W. 489, 63 A. L. R. 1051.

In Higgins v. Manson, 126 Cal. 467, 58 P. 907, 908, 77 Am. St. Rep. 192, it is stated: "The form of the writing is not important, provided it sufficiently appears that it was thereby intended to create a security. If that intention appears, it will create a mortgage in equity, or a specific lien on the property so intended to be mortgaged."

It is especially true that no particular form of instrument or words is necessary to create an equitable mortgage, if the parties so intended, in states in which the common-law theory of a mortgage, involving the conveyance of the legal title, has been replaced by the equitable lien theory. In the operation of the equitable mortgage or lien theory, no title passes to the mortgagee by virtue of the mortgage, and foreclosure and sale are always essential before the mortgagor is deprived of the property.

In Nevada we have a statute, N. C. L., vol. 4, sec. 9065, recognizing the equitable theory of mortgages as existing in this state, which is as follows: "A mortgage of real property shall not be deemed a conveyance, whatever its terms, so as to enable the owner of the mortgage to take possession of the real property without a foreclosure and sale."

The opinions in the cases of Orr v. Ulyatt, 23 Nev. 134, 43 P. 916; Yori v. Phenix, 38 Nev. 277, 149 P. 180; Southern Pacific Co. v. Miller et al., 39 Nev. 169, 154 P. 929; Brockman v. Ullom, 53 Nev. 287, 299 P. 677; and Hannig v. Conger, 54 Nev. 388, 19 P. 2d 769, clearly disclose that the equitable mortgage or lien theory prevails in this state.

In the instant case, the respondents, Ray and Georgalee Crider Flynn, made the foregoing assignment (plaintiff's exhibit "C") to appellant, Flyge, of the contract of September 11, 1941, with Dressler, to secure the payment of their promissory note for $900 and

interest. In such assignment, in addition to assigning their interest in said contract, they assigned, also, all their right, title and interest in and to "any and all real and personal property situated on the real property described in the above agreement."

■ A vendor, retaining the legal title for security, to secure the payment by the vendee of the unpaid balance of the purchase money upon a contract for the sale of real estate, has, in effect, an equitable mortgage or lien upon the property. The equitable interest retained by him is commensurate with the amount of the unpaid purchase money, as provided by the contract of purchase and sale.

There are many cases which hold that a vendor in an executory contract for the sale of real estate, holding the legal title for security (which, in effect, is an equitable mortgage or lien to the extent of the interest in the property equivalent to the amount of the unpaid purchase money), who borrows money from a third person and assigns all his interest in the contract of purchase and sale, to secure the loan, without expressly assigning any property, is deemed, in equity, to have intended to assign, not only his interest in such contract, but also, an equitable interest in the real property equivalent to his equitable lien for such unpaid purchase money.

This is upon a theory similar to that which prevails to the effect that the holder of a promissory note, secured by a mortgage or lien, if he assigns the principal obligation—the note, is deemed to have assigned, also, the mortgage, as an incident thereto. The reason for this doctrine, apparently, is that one who incurs an obligation and transfers to his creditor, as security, the obligation of another which he holds, and for which he has security, should give his assignee (creditor), the benefit of the security.

In 66 C. J., p. 1067, it is stated: "A vendor may assign a contract for the sale of land for security. The assignment vests in the assignee a lien upon the vendor's

interest in the property to the extent of the debt secured, not exceeding the purchase money unpaid on the contract."

The following cases are cited in support of the text: Lamm v. Armstrong, 95 Minn. 434, 104 N. W. 304, 111 Am. St. Rep. 479, 5 Ann. Cas. 418 and note; Big Ben Land Co. v. Hutchings, 71 Wash. 345, 128 P. 652; Marion Mortgage Co. v. Grennan, 106 Fla. 913, 143 So. 761, 87 A. L. R. 1492; Williams v. Johns, 34 Ohio App. 230, 170 N. E. 580.

The case of Lamm v. Armstrong, supra, has been stressed by appellant. The reasoning of that case is clear, and supports the view that the mere assignment of the contract of purchase and sale vests in the assignee all rights of the assignor (vendor), including the lien, or equitable mortgage, retained by the vendor as security; but the facts involved in that case were that there was not merely an assignment by the vendor of his interest in the contract, but also an express assignment to the assignee of all the right, title, and interest of the vendor in the land described in the agreement. It was unnecessary in that case, therefore, for the court to decide what the situation would have been had there not been an assignment of the land, and much of the language employed by the court was, therefore, dictum. While, as we have said, there are numerous authorities requiring no more than the mere assignment of the contract, without mention of the assignment of any property, as a basis for the operation of the rule that an equitable lien as against the vendor's interest in the land passes as security to the assignee, as an incident to the principal obligation, there are other authorities which expressly hold to the contrary. In 66 C. J., pp. 1065, 1066, in treating assignments by vendors, their operation and effect, it is said: "The mere assignment of the contract does not transfer any right in the land, but is an assignment giving the assignee the authority to receive the purchase money."

Under this statement of the text is cited: Youmans

v. Edgerton, 91 N. Y. 403; Jackson v. West, 224 Mich. 578, 194 N. W. 1000 (where a vendor, under an executory contract of sale traded his rights under the contract to another, such other could become owner of the contract with power to perform or enforce it only by conveyance of the property, and assignment of the contract to him); Button v. Traders' Trust Co. of Tacoma, 157 Wash. 625, 289 P. 1010; Grace v. Kuebler, 11 Alta. L. 205, appeal dismissed 56 Can. S. C. 1.

■ In the instant case, if the assignors, in the matter of the foregoing assignment made April 6, 1942, had contented themselves by assigning merely the contract, it would then be incumbent upon us to decide which line of authorities to follow; that is to say, whether we could see our way clear to follow the line of authorities holding that the mere assignment of the vendor's rights under the contract carries to the assignee, as an incident, such an equitable interest in the assignor's equitable mortgage or lien as will secure the payment of the indebtedness held by the third party, to whom the vendor has made the assignment, not to exceed, of course, the balance due by the vendee upon the purchase money; or whether we should follow the other line of authorities, which hold that the mere assignment of the contract carries no interest in the land. But the assignors, Ray Flynn and Georgalee Crider Flynn, did not content themselves with merely assigning their rights as vendors under the contract of sale. Perhaps their assignee was unwilling to accept the assignment of the contract alone, without any mention or express inclusion of property or (which is more likely) perhaps Mr. Davidson, who was the attorney for the Flynns and drew the instrument, did not deem it advisable for the Flynns to further encumber the land under contract of sale to Mr. Dressler, who had, in his contract, expressly assumed the Bridgman mortgage, and might not wish the status of the property changed by further encumbrance. We do not know what the motive was, in employing in the assignment, to describe the property assigned (or equitably

mortgaged), the language used, namely, "any and all real and personal property situated on the real property described in the above agreement," which clearly were words of limitation, and, in the light of reasonable construction as to their meaning, do not indicate any intention to include or to assign the basic real property, that is, the land itself.

In the Flynn-Dressler agreement of September 11, 1941 (plaintiff's exhibit "B"), for the sale of the property therein described, and which was clearly referred to by the phrase, "described in the above agreement," used in said assignment (plaintiff's exhibit "C"), the parcels of land therein agreed to be sold are enumerated and described, all water rights and other appurtenances are described, and immediately thereafter, as part of the described property agreed to be sold to Dressler, is the clause, "together with all the improvements *thereon* and the ranch equipment now *upon* the property." (Italics ours.)

■■ The Flynns, the assignors in the matter of said assignment to Flyge, and being the vendors in such contract of sale with Dressler, had, in effect, retained the legal title to the land and the appurtenances enumerated and described in the agreement, "together with all the improvements thereon and ranch equipment now upon the property," which, in equity, amounted to an equitable mortgage or lien upon each class of property mentioned, to wit, the land, the appurtenances, the improvements and the ranch equipment. In assigning to Flyge, they could, of course, have agreed upon and contemplated an assignment of all said property, or a part thereof, as security for the $900 note. We must determine the intention in that regard from the language of the assignment itself, or from the surrounding circumstances, or both. Pomeroy Eq. Jur., 5 ed., vol. 4, p. 698; Hibernian Banking Association v. Davis, 295 Ill. 537, 129 N. E. 540, 542; Redemptorist Fathers of State of Washington v. Purdy, 174 Wash. 358, 24 P. 2d 1089 (cited by respondent, Aldabe, in his answering

brief). The note, for the security of which the assignment was made, being for $900, it is reasonable to believe that the parties to the assignment may readily have concluded that, inasmuch as the assignment carried to the assignee the right to the balance of $2,250 due under the provisions of the Dressler contract, upon the purchase price of the property, that an assignment of the equitable lien and mortgage of the Flynns upon a part of the property, namely, "all the improvements and ranch equipment * * *," would be sufficient security for the sum loaned. If such were the intention, the language used, "all the real and personal property situated upon the real property described in the above agreement," would be sufficient to describe such improvements and ranch equipment.

In 27 Am. Jur. p. 260, it is said: "* * * the term 'improvements' in the broad sense includes buildings and fixtures of all kinds." And on page 261 of the same volume it is stated: "As a general rule, improvements of a permanent character made *on* real estate and attached thereto without the consent of the owner of the fee, by one having no title or interest, become a part of the realty and vest in the owner of the fee as his own property within the protection of the law which renders the removal or destruction thereof an act of waste." (Italics ours.)

So, improvements or fixtures, such as the Diesel engine and deep-well pump, so frequently referred to in the instant case, if attached to the realty, having, as they do, an individual form and identity sufficient to distinguish them from the real estate proper, would clearly be, "real property situated *on* the real property described in the agreement." (Italics ours.) Any buildings upon the land would be in the same category.

In Jones on Mortgages, vol. 1, p. 237, sec. 202, it is said: "A mortgage of improvements conveys no title to the land itself. It passes only a right to the improvements placed upon the land by the mortgagor, or an equitable right to compensation for them in case the

owner of the land should take possession. A subsequent acquisition of the title to the land by the mortgagor does not in such case inure to the benefit of the mortgagee. A mortgage of a building erected on leased land under an agreement, that the lessee might remove it, or the lessor should pay for it at its appraised value, is a mortgage of *realty* falling within the designation of a chattel-real at common law, and should be recorded as a mortgage of real estate, and not as a chattel mortgage." (Italics ours.)

■ So, from the foregoing, it appears that improvements are real estate, and being upon real property, we can say with certainty that they constitute, and may be properly described as, "real property situated on real property."

■ A fixture has been, we believe, correctly defined in Frost v. Schinkel, 121 Neb. 784, 238 N. W. 659, on page 663, 77 A. L. R. 1381, wherein it is stated: "A distinguished authority upon real property in a lecture to law students defines a fixture as a chattel brought in and upon and annexed to real property, which retains its separate identity and becomes realty, but which under certain circumstances may become personalty again."

In 22 Am. Jur. p. 715, it is said that: "The general course of modern decisions, in both English and American courts, is against the common-law doctrine that the mode of annexation of a fixture is a criterion, whether slight and temporary or immovable and permanent, and in favor of declaring all things to be fixtures which are attached to the realty with a view to the purposes for which it is held or employed."

In footnotes 9 and 10, on said page 715, many cases in support of this doctrine are cited.

It is stated in 22 Cal. Jur. p. 417 that: " 'Real property' included both land and things which are affixed to land. Mining claims, water courses, oil, growing timber, growing crops (under certain circumstances), buildings attached to the soil, and other substances so attached

as to be considered in law a part thereof, are real property."

Such things, attached to the land, retain their separate identity, and to distinguish them from the basic real property itself, it appears that the clause, "real property situated on real property" is appropriate and its meaning clear.

In vol. 17, Words and Phrases, Perm. Ed., "Fixture," p. 146, occurs the following: "Water pump and gasoline engine and accessories installed on marsh lot to supply water to adjacent higher lot held 'fixtures' to higher lot, title to which passed to purchaser at sale under power in security deed to higher lot. Code 1933, sec. 85–201; Blain v. Corbin, 51 Ga. App. 472, 180 S. E. 854, 855."

In Sowden & Co. v. Craig, 26 Iowa 156, 96 Am. Dec. 125, the property in controversy consisted of two engines, two boilers, one circular saw, one muley saw and appurtenances. The court, in its opinion, said: "This property, it will be borne in mind is the legitimate subject for fixtures, and is that class of property about which the law permits parties to contract so as to control, as between themselves, its character, after being affixed, making it either personal property or real estate."

Under the subheading, "Section 14 — Constructive Severance.—," it is stated, in 22 Am. Jur. p. 727, that:

"Parties, as between themselves, may by agreement give a fixture the character of personal property without an actual severance. Such an agreement, however, will not be permitted to impair the rights of third persons. Thus, without a physical detachment an owner may by a proper contract of sale sever a fixture, thereby converting it into personal chattel.

"Likewise, it has been held that the giving of a chattel mortgage on fixtures by the owner thereof will effect a constructive severance. Furthermore, the listing of fixtures, by their owner as personal assets in a bankruptcy schedule has been held to reinvest them with their character as personalty and effect a constructive severance."

Citing, in footnotes 7 and 8: Eaves v. Estes, 10 Kan. 314, 15 Am. Rep. 345; Dudley v. Foote, 63 N. H. 57, 56 Am. Rep. 489; Annotation, 62 A. L. R. 255.

The foregoing authorities all sustain the view that the term "improvements" used in the Flynn-Dressler contract, is practically synonymous with the term "fixtures," and in view of the subsequent acts of the parties was evidently believed, at least by Flyge, by the Flynns (if, at the time said contract was executed, September 11, 1941, they did not then know that the engine and pump had been removed a few days before), and by their attorney, Mr. Davidson, to relate to the Diesel engine and deep-well pump affixed to the realty. And, at the time of the preparation and execution of the assignment (equitable mortgage), April 6, 1942, and before constructive severance could be deemed to have occurred by its operation and effect, Mr. Davidson, who drew the assignment, instead of using the same expression, "improvements," used the clause, "real * * * property situated upon the real property," which, in the light of the intention of the parties, was practically synonymous with the term "improvements."

The term "ranch equipment," as used in the said Flynn-Dressler contract, in connection with the word "improvements," was broad enough to include things not in their nature realty, if affixed to the real estate, such as a Diesel engine and pump; and to include also personal property situated on the premises (or realty), and undoubtedly was considered the basis for including, in the description of the property assigned, the term * * * "and personal property situated on the real property." The word "equipment" is defined in 30 C. J. S., on p. 295, as "the collective designation for the articles comprising an outfit, whatever is used in equipping"; also as, "The outfit, that is, tools, machinery, implements, appliances, etc., necessary to enable one to do the work involved"; citing, in footnote 7: Linde Air Products Co. v. American Surety Co., 168 Miss. 877, 152 So. 292; Edkins v. Board of Education of City of New York, 261

App. Div. 1096, 26 N. Y. S. 2d 996, 997; and citing in footnote 10; Jewett v. School District No. 25 in Fremont County, 49 Wyo. 277, 54 P. 2d 546, 548, in which it is said, referring to the term "equipment": "The term 'equipment' is broad, and may include articles which are attached to the building as an integral part thereof, as well as articles not belonging to that category."

The term "all real and personal property situated on the real property," taken literally, would perhaps be broad enough to include all property forming part of the realty and yet possessing such individual physical form and character as to be identifiable and distinguishable from the land itself; such, for example, as growing timber (fructus naturales) and growing crops (fructus industriales). Also, the term "* * * personal property situated on the real property," construed literally, and referring to the date of the assignment, might include personal property placed on the premises after the Flynn-Dressler contract was made, September 11, 1941, and prior to the date of the assignment of April 6, 1942; but, from the surrounding circumstances, it is not reasonable to believe it was intended to include, in the assignment, any property not included in the descriptive term "all improvements thereon and the ranch equipment now upon the property," which occurs on the second page of the agreement of sale between Flynn and Dressler, made September 11, 1941 (plaintiff's exhibit "D"). Aside from the land, it was upon the improvements and ranch equipment on the property, September 11, 1941, when the contract was made, that Flynn had the equitable mortgage or lien, and it was undoubtedly upon that property that Flynn intended, by the assignment, to transfer to Flyge an equitable lien and mortgage as security for the repayment of the loan of nine hundred dollars and interest.

That Flyge, and his attorneys, so understood is clearly indicated by the fact that it is alleged in lines 8–11, page 2, of plaintiff's amended complaint, "that at the time of making said contract, exhibit 'A,' the hereinafter

described Diesel engine and deep well pump were upon said premises and constituted part of the ranch equipment," and it is also indicated by the fact that, on page 3 of said amended complaint, appellant sets forth the assignment to appellant, containing, as the term descriptive of the ranch equipment, including the Diesel engine and pump, the clause, "any and all real and personal property situated on the real property." That the appellant and his attorneys so construed it is further indicated by the fact that, upon that basis alone, he prayed for damages against W. A. Dressler and Allied Equipment, Inc., for the wrongful removal of said "equipment."

The appellant then had no difficulty in identifying the engine and deep-well pump as being "real * * * property situated on the real property" covered by his lien, and it is notable, in that connection, that said amended complaint contains no allegation or claim, either in the body thereof or in the prayer, that the *land* is included in the assignment, or that he had any lien thereon; but after, in paragraph V, on pages 4 and 5, alleging facts concerning the deed of trust to Kearney, and that $632 of the money he, Flyge, loaned Flynn had been paid Kearney, and that he did so on the agreement of Flynn that he would be given the same security as Kearney, he prayed, further, in paragraph (c), on page 7 of said amended complaint, that as security for moneys due him the court adjudge and decree a lien in favor of plaintiff upon the undivided one-half interest in said premises, and that said lien be foreclosed. In other words, not on the basis of the assignment or any existing lien by virtue thereof, but because, as he claimed, there was an understanding that he would have the same security as Kearney, he asked the court to decree a lien, but did not allege any facts further than the bare assertion of such an agreement, without identifying it as to form, time or place. And at the trial he utterly failed to prove any such agreement. From the language employed in the assignment, which is clear in its meaning, and undoubtedly was merely an expression, in different

language, of the intention to assign "all improvements and ranch equipment" then on the property, and from the fact that that identical construction was given it and acted upon by appellant, in his pleadings in this case, it is our conclusion that by the term "all real and personal property situated on the real property" the parties did not intend an equitable mortgage on the land, but only upon such improvements or fixtures and ranch equipment as were then upon the property, and that the parties had the Diesel engine and pump and other ranch equipment particularly in mind.

There was no difficulty in determining, or in being able to identify the assigned property. "All real and personal property situated on the real property described in the agreement," as shown by the above definitions, meant no more than that one seeking to identify the property go upon the land and, eliminating from consideration the land itself, determine what fixtures or improvements were annexed to the soil, and what articles of personal property were there, on the date of the assignment. In Pomeroy on Eq. Jur., vol. 4, sec. 1235, p. 698, the requirement as to certainty of identification is stated as follows: "In order, however, that a lien may arise in pursuance of this doctrine, the agreement must deal with some particular property, either by identifying it, or by so describing it that it can be identified, and must indicate with sufficient clearness an intent that the property so described, or rendered capable of identification, is to be held, given or transferred as security for the obligation."

Counsel for respondent, Aldabe, in respondent's answering brief, on page 22, reaches, we believe, an erroneous conclusion that "no real property could be situated on real property" so described in said agreement, because, as he has stated, "the word 'situated' means having a site, situation, or location; as, a town situated on a hill." Citing Webster's International Dictionary, 2d Ed., Unabridged. This is due to the unwarranted assumption that the term "real property"

necessarily means the land only, and is not broad enough to include chattels real which have become part of the realty by being affixed thereto.

The improvements or fixtures, including the machinery (the Diesel engine and pump), and the ranch equipment, which were obviously intended by the parties as the property being assigned, had a definite situation or location upon the land described in the agreement, "as a town situated upon a hill," and could be as readily identified. The attorneys for the appellant, apparently sensing that such an assumption strengthened their theory, indicating a reformation of the assignment, readily acquiesced in such assumption and theory, notwithstanding that, for many months after the assignment was executed, they had not conceived such an idea, as shown by their original and amended complaints.

The appellant, on page 34 of his opening brief stated: " 'In and to any real and personal property on the real property,' etc. obviously contains a false call as to the realty being situated upon other realty."

■ And cited cases in which calls that were really false had been rejected. In the instant case, where the obvious meaning is that there was no intention to assign or equitably to mortgage the land, to reject the words "situated on the real property" would be entirely unwarranted. We would thereby be creating an equitable mortgage on the land itself, which the parties themselves have not created and did not intend to create. On page 39 of his opening brief, the appellant, along the same line, suggested that "if a comma were inserted after the word 'real' the clause which reads 'We further assign all of our right, title and interest in and to any and all the real' etc. the agreement would be perfectly plain and clear." This would not accomplish what counsel desire, unless the word "property" were inserted before the proposed comma, or in lieu thereof. To do so, however, would likewise be unauthorized, as we would thereby be creating, and foisting upon the parties, an agreement not intended by them.

On page 8 of his opening brief, the appellant stated: "Being for security, we contend said document constitutes an equitable mortgage or lien on the lands described in the Dressler contract, and this too, as between the parties thereto, even if the entire clause regarding assignment of interest in real and personal property had never been added or if it be now disregarded."

 This is quite true, according to one line of authorities, as hereinbefore set forth, for such equitable mortgage or lien would, according to the theory adopted by such authorities, be implied as an incident to the assignment of the principal obligation of the purchaser, under the contract, to pay for the land. But such clause *was added*, thereby excluding the land from the agreed assignment and negativing any reasonable basis of fact upon which to predicate a conclusion that the parties intended to include the land. (Italics ours.) As in the foregoing instances of suggested changes, this drastic change could not be made by this court and a new contract thereby created, in the absence of any showing whatever of mistake, by clerical error, inadvertence or otherwise, or failure of the agreement to conform to the true intention of the parties, as a ground in equity, for reformation. And such reformation could only be made upon a proper showing by the pleadings, and subsequent proof, as between the parties, and certainly could not be permitted to operate to the detriment of a purchaser in good faith for value, and without notice of any such latent equity.

So much for the language of the instrument. The other instrumentality afforded us as a means of determining the intention of the parties, is the "surrounding circumstances."

What, if any, circumstances exist, which indicate, or tend to indicate, that the parties to the assignment intended to assign or transfer, for security, an interest in, or equitable mortgage or lien upon the land? We find none in the record.

Other surrounding circumstances, in addition to the

language used, exist, clearly disclosing that the parties, at the time of the assignment, intended an assignment of the improvements or fixtures only, and of the ranch equipment, and not of the land.

If the land was intended, why were not some words used in the assignment so indicating?

■ Furthermore, very persuasive is the conduct of Flyge and his attorneys, subsequent to April 6, 1942, as clearly revealing their interpretation of the assignment, as is apparent from the pleadings; there was no effort made to claim, on the basis of the assignment, any equitable mortgage or lien, on the land, until appellant moved the court for leave to file an amendment to the amended complaint in order to bring in Aldabe as a party defendant, and made an affidavit in support of such motion claiming an equitable mortgage on the land. This was about twelve months after the assignment was made, and was after repeated efforts, by letters, and in the action itself, to obtain damages for the removal of the engine and pump, had proven unsuccessful.

The allegation in paragraph V, pages 5 and 6, of the amended complaint (repeatedly referred to by respective counsel for the respondents, in their briefs, and by the trial court in its written opinion deciding on the motion for a new trial), clearly shows, as we interpret same, that the appellant relied heavily, for security, upon the Diesel engine and pump, which, as he there alleges, he believed, on April 6, 1942, when he accepted the assignment, were then upon the premises: "That prior to April 6, 1942 plaintiff had knowledge of said ranch equipment being upon said premises and on said April 6, 1942 plaintiff believed said Diesel Engine and Deep Well Pump were then upon the premises; that if plaintiff had then known that said equipment had been removed he would not have consummated said loan transaction; that without said equipment the security offered would be inadequate."

We do not agree with counsel for appellant, as argued

in their reply brief to the answering brief of respondent, Aldabe, on pages 3 and 4 of appellant's said brief, that said statement would have been "entirely conservative and true," if Flyge then had believed he possessed an equitable mortgage or lien upon the land. Flynn's one-half interest in the land, as shown by the sale to Aldabe, had a sale value of $8,000, which, after deducting the full amount of the mortgage, $5,500 and interest, left between $2,400 and $2,500. It is ordinarily unnecessary to sell an undivided one-half interest separate from the other one-half interest, and thus sacrifice unreasonably, as counsel argues as a basis for depreciated value. Certainly, the value would have been far more than the $900, and if Flyge had believed the land was included in his assignment, he could not have truthfully said, that "without said equipment the security offered would have been inadequate." It is very clear that he did not so believe, and obviously such idea was conceived and developed subsequent to the filing of the amended complaint, on December 29, 1942, in which the above quoted allegation occurs.

█ In determining the meaning of a contract or agreement, the interpretation which the parties themselves have placed upon it is given great, and oftentimes, controlling effect by the courts. In 12 Am. Jur. p. 787, in dealing with the subject of contracts, in section 249, under the heading "Interpretation by parties," there is stated the prevailing doctrine, as follows: "In the determination of the meaning of an indefinite or ambiguous contract, the interpretation placed upon the contract by the parties themselves is to be considered by the court and is entitled to great, if not controlling, influence in ascertaining their understanding of its terms. In fact the courts will generally follow such practical interpretation of a doubtful contract. It is to be assumed that parties to a contract know best what was meant by its terms and are the least likely to be mistaken as to its intention; that each party is alert to protect his own

interests and to insist on his rights; and that whatever is done by the parties during the period of the performance of the contract is done under its terms as they understood and intended it should be. Parties are far less likely to have been mistaken as to the meaning of their contract during the period when they are in harmony and practical interpretation reflects that meaning than when subsequent differences have impelled them to resort to law and one of them seeks an interpretation at variance with their practical interpretation of its provisions. * * *"

In footnotes 4 and 5, on pages 788 and 789, there are many cases cited, from numerous jurisdictions, in support of the text.

Appellant's attorneys, in their reply brief to answering brief of respondent, Charles Aldabe, on page 4, have stated: There is no plea and no evidence showing existence of *any personal* property which as to value, etc. might be assumed to have been intended by Flynn and accepted by plaintiff as adequate security for the $900 loan. If it be said the Diesel Engine and deep well pump might constitute such adequate security, the answer is that said engine and pump had been sold by Flynn and removed off the premises by the purchaser more than six months prior to plaintiff making said loan on April 6, 1942. So Flynn at least certainly could not have intended (on April 6, 1942) the assignment mortgage to cover the then non-existent engine or pump."

This assumes that Flynn could not have perpertrated a fraud.

If the allegation, in effect, that Flyge believed the Diesel engine and pump were upon the premises, April 6, 1942 (amended complaint, paragraph V, pages 5, 6), is true, it is clear that the assignment on April 6, 1942, of the Diesel engine and pump, for security, after Mrs. Flynn and Mr. Davidson (then attorney for the Flynns) had been informed by Dressler, on April 3, 1942, of their removal, without disclosing same to Flyge, was fraudulent. And it is reasonable to believe that Mrs. Flynn,

after she received such information, had disclosed it to her husband, prior to the execution of the assignment, three days after she was so informed. It seems improbable that Flynn, the owner of the property, knowing he had authorized, in the lease of November 20, 1940, Dressler to sell the engine and pump, had not been sufficiently careful, as to his own property, to ascertain whether or not the engine and pump were there when the contract of September 11, 1941, was made, to sell the property to Dressler. Thus Flynn knew, when he assigned to Flyge, April 6, 1942, not only that the engine and pump had been removed, but also that, if such removal had occurred prior to the execution of the contract of September 11, 1941, no cause of action would lie for their removal, and that Flyge was receiving nothing whatever, not even a possible cause of action (which might or might not have passed to him as assignee under the assignment of April 6, 1942, without any specific assignment of such cause of action, if the removal occurred after September 11, 1941), in lieu of the engine and pump. But it is possible, of course, that Flynn was careless, and had not learned of the removal of said engine and pump prior to September 11, 1941, and believed, therefore (without any investigation or any sound basis in law or fact for such belief), as, apparently, Davidson believed, and as perhaps Mrs. Flynn believed (she testified she did not know of their removal until Dressler informed her, April 3, 1942) that the same had been removed by Dressler after September 11, 1941, and that there would be a good cause of action against Dressler and the purchaser for wrongful removal and conversion, which might inure to the benefit of Flyge, as assignee.

This meant that Mrs. Flynn and Davidson and, most likely, Flynn, were at least cognizant, at the time of the assignment, that they were assigning, as being upon the real property, a Diesel engine and pump that were not then there, and without disclosing the fact of their removal, to Flyge. Flyge's remedy would seem to be an

action for damages for the fraud. His plight by reason of such unjustified assignment of the Diesel engine and pump is unfortunate, but he is not entirely free from blame. He could, no doubt, by proper inquiry of Dressler, when he visited the ranch, April 3, 1942, have ascertained the facts as to the removal and the time thereof.

If Flyge had been informed by the Flynns and Davidson, as he should have been, of the removal of the engine and pump prior to April 6, 1942, of which they well knew, he, most likely, being a business man of experience, would not have completed the transaction without adequate security in lieu of the engine and pump. It is possible that under such circumstances he would not have made the loan unless the land itself were assigned, for security. Not knowing the fact that the engine and pump were not then on the real property, he did not sense the need for additional security.

While we deplore the fact that it appears that a fraud was perpetrated upon Flyge, we are powerless upon this appeal, in view of the existing facts and circumstances and well settled principles of legal construction of such instruments, to read into the assignment words which are not there. Neither the district court, nor this court, is empowered or authorized to make a new contract, as between the parties, which they did not themselves make. Neither have we the power or authority to create an equitable mortgage or lien upon the said property to compensate Flyge for his loss, or by way of punishing the Flynns for the fraud, reprehensible though it was.

From the plain meaning of the assignment itself, and also from the surrounding circumstances, we are impelled to the conclusion that the parties did not intend any assignment of the assignors' equitable mortgage or lien upon the land, or any interest therein, but only of the vendor's interest in the agreement of September 11, 1941, including the payments upon the purchase price of the property, and, also, the assignment of such equitable lien as the assignors had on April 6, 1942, upon

the improvements and ranch equipment (upon the "real and personal property situated on the real property"). The appellant was, of course, entitled, as the trial court found, to judgment upon the promissory note made and executed to him on April 6, 1942, for the principal sum of $900 and for interest and attorney's fees, as awarded by that court.

There is a very reasonable maxim which is frequently applied in the construction of statutes, and also of deeds, conveyances, contracts, and other instruments, which we believe is proper and appropriate to apply in the instant case. Such maxim is, "expressio unius est exclusio alterius."

The assignment to appellant, by the Flynns, for security, on April 6, 1942, of all their right, title and interest in the purchase and sale contract between Ray Flynn and W. A. Dressler, made and entered into September 11, 1941, expressly mentioned the said contract and "all their right, title and interest in and to any and all real and personal property situated on the real property described in the above agreement." In the said agreement thus referred to, the property agreed to be sold was certain parcels of land, "together with all the improvements thereon and the ranch equipment now upon the property." By including in the assignment all the vendor's rights under the contract, and using the language equivalent in meaning to the term "improvements and ranch equipment," that is to say the term "real and personal property situated on the real property," and omitting the land, the intention to exclude the land is clear. In the Matter of Attorney General, 2 N. M. 49, on page 56, it is stated: "Now no maxim of law is of more general and uniform application than 'expressio unius est exclusio alterius,' 'the expression of one thing excludes others.'" See, also, 50 Am. Jur. 238, and many cases cited in footnote 19, including: In re Taylor's Estate, 61 Nev. 68, 114 P. 2d 1086, 135 A. L. R. 580; In re Bailey's Estate, 31 Nev. 377, 103 P. 232, Ann.

Cas. 1912A, 743. We cite, also, Virginia & Truckee R. Co. v. Elliott, 5 Nev. 358. In footnote 13 of the text it is said: "That which is expressed makes that which is implied to cease." (Citing Black's Law Dictionary, 2d ed., p. 468). In 25 C. J. 220, note 17, and in 35 C. J. S. 283, note 57, many hundreds of cases are cited, revealing the extensive application of this maxim.

It necessarily follows from the conclusions we have reached, as above indicated, that it is unnecessary for us to consider any of the appellant's four basic contentions as stated on page 3 of his opening brief, other than the first thereof, designated as (a), hereinbefore quoted, and which is disposed of by the foregoing statement of our views.

■ It follows that appellant's assignments of errors Nos. I, II, III, VI, VIII, IX and X are without merit. As to assignments Nos. IV and V, in view of our conclusion that there was no equitable mortgage or lien upon the land, by virtue of the assignment of April 6, 1942, to appellant, it necessarily follows that whether or not such assignment was so recorded as to constitute constructive notice, and all matters concerning notice, whether actual, imputed or constructive, are immaterial. If Aldabe had actual notice of the assignment, and its terms, it would not be any notice to him that the appellant had any interest in the land. Assignment No. VII related only to respondent, Dressler, and was waived.

For the reasons stated, the judgment of the trial court and that court's order denying appellant's motion for a new trial are hereby, in all respects, affirmed.