[S. F. No. 1020.   Department Two.—August 6, 1898.]

In the Matter of the Estate of ALEXANDER P. MORE, Deceased.   JOHN F. MORE, as Administrator, etc., and as Heir at Law, Appellant, v. E. M. MILLER et al., Respondents.

LEASE—LIVESTOCK—STIPULATED NUMBER—REASONABLE CARE.—A lease of an island with all the livestock thereon, requiring the lessee to increase and keep the cattle up to the number of 1,500, and the sheep to the number of 40,000, and to deliver them up at the end of the term, cannot be construed as permitting the lessee to deliver up any less than the stipulated number, in case he could not, by reasonable care and proper husbandry, have acquired so many during the term.

ID.—DUTY OF LESSEE AS ADMINISTRATOR—SETTLEMENT OF ACCOUNTS—CHARGE FOR DEFICIENCY.—Upon the death of the lessor before the expiration of the term, the lessee, having become the administrator of his estate, is bound, immediately upon such expiration, to turn over to himself, as administrator, the stipulated number of cattle and sheep; and, upon his failure to do so, he must be charged in the settlement of his accounts with the value of the cattle and sheep not so turned over.

ID.—ANNUAL ACCOUNT OF ADMINISTRATOR—JURISDICTION.—The court is authorized to hear and determine the extent of the deficiency for which the administrator is liable as lessee, in the settlement of his annual account, and to charge him for the deficiency, in such settlement, and is not bound to await the settlement of his final account.

ID.—EVIDENCE—COUNTING OF SHEEP—REGISTERING MACHINE—WITHDRAWAL OF TESTIMONY.—The correct number of the sheep remaining on the leased island having been proved by sufficient evidence, independently of the testimony of a witness who testified that, in counting them, under an order of the court, he had used a registering machine to check off the numbers, which worked correctly, and who produced a duplicate thereof in court, the one used having been given away, the permitted withdrawal of his evidence relating to the registering machine, after opposing counsel had requested leave to examine and exhibit it for the purpose of showing that such machines were unreliable, is not prejudicial error.

ID.—EXPERT EVIDENCE—AVERAGE INCREASE OF LAMBS.—The uncontradicted evidence of a witness that he had been in the sheep business for

twenty-six years, and was familiar with sheep husbandry, is sufficient to justify the court in permitting him as an expert to testify to the average increase of lambs in a flock of 40,000 sheep in the spring of the year.

ESTATES OF DECEASED PERSONS—ACCOUNTS OF ADMINISTRATOR—USE OF LAND FOR PERSONAL BENEFIT.—An administrator is chargeable in the settlement of his accounts with the reasonable value of the use of land belonging to the estate which he has occupied for his personal benefit subsequently to his qualification.

ID.—SERVICES OF BOOKKEEPER—DISCRETION.—The question whether an administrator should be allowed for payments made by him for the services of a bookkeeper for the estate depends upon the circumstances; and its decision is matter of discretion with the judge settling his accounts. If the services were such as, under the circumstances, the administrator ought to have performed, and for which his commissions are intended to compensate him, such charge should be disallowed.

ID.—EVIDENCE—CLAIM OF BOOKKEEPER AGAINST ESTATE.—A large claim presented by the bookkeeper of the administrator against the decedent, however objectionable upon its merits, is not relevant or admissible in evidence, upon the question as to whether the services rendered by him as bookkeeper of the administrator were or were not properly chargeable to the estate.

EVIDENCE—ANSWER NOT RESPONSIVE—HEARSAY.—Where the answer of a witness is not responsive to the question propounded to him, and is hearsay, it is proper to strike it out.

APPEAL from an order of the Superior Court of the City and County of San Francisco settling the annual account of an administrator. J. V. Coffey, Judge.

The facts are stated in the opinion.

Rodgers & Paterson, A. G. Eells, and Thomas McNulta, for Appellant.

J. B. Mhoon, and C. A. Storke, for Respondent.

BELCHER, C.—This is an appeal by John F. More, as administrator of the estate of Alexander P. More, deceased, and individually as an heir at law of said deceased, from a decree settling the second annual account of said John F. More, as administrator of said estate.

Alexander P. More died October 21, 1893, and John F. More was appointed administrator of his estate February 12, 1894. The second annual account of the administrator was filed March 5, 1896, and accompanying it was a lengthy report as to the prop-

erty of the estate and what had been done with portions thereof.

To the account so filed certain heirs of the decedent filed exceptions in writing and contested numerous items thereof. When the matter came on for hearing it was stipulated by all parties in interest that all testimony introduced by any one contestant should be considered as introduced on behalf of all the contestants; and that all testimony introduced by the administrator should also be considered as introduced on behalf of John F. More individually. After the hearing the court filed its "findings of fact and conclusions of law," and made an order thereon, in which some of the objections made by the contestants were sustained, some overruled, and others reserved for future consideration, with directions that the items reserved be included in the next account.

The bill of exceptions contains numerous specifications of the particulars in which it is claimed the evidence was insufficient to justify the findings of fact, and also numerous exceptions to the conclusions of law drawn from the facts; but, as only a few points are discussed by the learned counsel for appellant, we shall not consider those not noticed in their brief.

1. It appears from the record that on October 1, 1891, the decedent leased to John F. More the property known as Santa Rosa Island "together with the cattle, horses, flocks, and herds of livestock of all kinds on said island," for the term of three years, to wit, from October 1, 1891, to October 1, 1894, for the annual rent of $10,000, payable on the first day of June of each year. The lease provided that the lessee "shall and will at his own proper costs and charges bear, pay, and discharge all such taxes, duties, and assessments whatsoever as shall or may, during the said term, be charged, levied, or imposed upon the said premises or property," and also that the said lessee shall have "all the increase of the stock, flocks, and herds on said island, and the proceeds thereof, during the term of this lease, upon the express understanding and condition, however, and it is hereby expressly agreed by the parties hereto, that the cattle on said island shall be increased and kept up to fifteen hundred (1500) head, and that the flock of sheep shall be grown up to forty thousand (40,000) head of sheep, and that the said lessee shall, at the end of said term, turn over and deliver to said lessor, or his assigns, that

number, to wit, forty thousand head of sheep in good quality and condition, and that the said lessor shall have the fall clip of wool of the year 1894."

As the lessor was dead and the lessee was the administrator of his estate when the lease expired, it became the duty of the lessee to turn over to himself, as administrator, the said cattle and sheep. In the report accompanying his account the administrator states that he has on hand on the island 1,500 head of cattle, of the appraised value of $18,000, and 40,000 head of sheep, of the appraised value of $60,000, and "the increase of the flocks and herds of said estate on said island."

The court found that under the said lease John F. More "covenanted and agreed on his part to deliver to said A. P. More, his administrators or assigns, on the 1st of October, 1894, 40,000 head of sheep on Santa Rosa Island. That said John F. More, as said lessee, did not and has not at any time delivered to himself, as said administrator, or to anyone for said estate, a greater number of sheep than 25,789; and there was on the 1st of October, 1894, due from said John F. More to said estate, and there is still due from said John F. More to said estate, 14,211 head of sheep. That said sheep on said first day of October, 1894, were of the value of $1.50 per head."

The court further found: "That during the months of October, November, and December, 1895, said administrator John F. More sold to the Western Meat Company in San Francisco 480 head of cattle for the sum of $14,270.94. That 432 head of said cattle were the property of, and belonged to, the estate of A. P. More, deceased, and 48 head of said cattle were the individual property of the said John F. More.

"That the expense of marketing said cattle cannot be determined from the evidence now before the court. That of said $14,270.94, the gross proceeds of said sale, the estate of A. P. More was entitled to the sum of $12,843.85 and John F. More was entitled individually to the sum of $1,427.09."

And as conclusions of law from the foregoing facts the court found "that the administrator should charge himself with the sum of $21,316.50, the appraised value of 14,211 sheep, and interest thereon from the first day of October, 1894, at the rate of seven per cent per annum."

"Also that he should charge himself with the sum of $12,843.-85, being the gross proceeds of the sale of 432 head of cattle made as aforesaid by him in October, November, and December, 1895, and interest on the same from the seventeenth day of December, 1895, at the rate of seven per cent per annum, and that said administrator be allowed the expense of marketing said cattle in his next account."

These findings are assailed by the appellant as not justified by the evidence. As to the sheep, it is claimed: 1. That the lease, when properly construed, in effect, provided only that the lessee should increase the flock of sheep to the number of 40,000 head, if he could do so by the exercise of reasonable care and proper husbandry, and in that event he should turn over that number at the expiration of the lease; but if, by the exercise of such care and husbandry, he should be unable to increase the flock to 40,000 head, then he should turn over only such number as he might have; and that the burden was upon respondents to show that he had not exercised such care and husbandry, which they wholly failed to do, and hence that appellant was properly chargeable only with such number of sheep as he had at the time the lease expired and actually turned over; 2. That he did, in fact, turn over to himself, as administrator, the full number of 40,000 head; and 3. That the value of the sheep was only 50 cents per head, and not $1.50 as found by the court.

And as to the cattle, it is claimed that appellant had on the island 1,500 head which belonged to the estate, and that the 480 head which he sold were increase which belonged to him and which he had a right to sell on his own account.

As we read the lease it is not subject to the construction claimed for it; on the contrary, it provides in plain and unambiguous language that the lessee shall, at the end of the term, turn over and deliver to the lessor, or his assigns, 40,000 head of sheep in good quality and condition. And that this expressed the meaning and intention of the parties to the instrument is shown by the evidence given by appellant himself. He testified that the lease gave him the surplus of the sheep over 40,000 head, and that in September, 1894, he sold and shipped from the island 4,957 head of them, the last shipment of 1,040 head being made on the thirtieth day of that month, the last day of his lease.

He further said: "It is my understanding that under the lease I was to account for 40,000 head of sheep at the expiration of the lease. I have always held myself out as accountable for that number as of that date."

The question then is, Did appellant, as lessee, turn over and deliver to himself, as administrator, 40,000 head of sheep on the first day of October, 1894? The testimony in the case is quite voluminous, covering, in a partly condensed form, a little more than two hundred pages of the printed transcript. We have carefully read all testimony found in the record, and, while there is some conflict, we are of the opinion that it is quite sufficient to show that no greater number than that found by the court was ever turned over or delivered by appellant to himself, as administrator, or to anyone for said estate.

The sheep were appraised as of the value of $1.50 per head, and the court found that to be their value on October 1, 1894. There was evidence that they were of the value of $2 per head, and we find nothing in the record tending to support the claim that their actual value was only 50 cents per head, or that it was less than that found by the court.

As to the cattle: There is no dispute that at the time the lease expired the estate owned and was entitled to the proceeds of 1,500 head of cattle that were then being herded and fed on the island. Nor is there any dispute that during the last three months of 1895 appellant sold and shipped away 480 head of the cattle on the island. But the claim is that on October 1, 1894, there were on the island at least 1,980 head of cattle, and that the estate was, therefore, not deprived of any of its property by the sale subsequently made.

The court found, in effect, that there were only 1,548 head of cattle on the island on October 1, 1894, and that of the animals sold 432 head were the property of the estate and must be accounted for by appellant. The question is, Was this finding justified by the evidence? We think it clearly was. It is true that there was some apparent conflict, but when fairly considered, a clear preponderance of the evidence tended strongly to show that the whole number on the island was not greater than the number found by the court.

It follows, therefore, that the findings as to both the sheep

and cattle cannot be disturbed for want of evidence to justify and support them.

2. The court found: "That the said administrator, during the whole period since his qualification as such administrator, has grazed and used for his own personal benefit and gain the island of Mescalitan or Little Island, and the tidelands adjacent thereto, being part and parcel of the property belonging to said estate held by him as said administrator. That the reasonable value of such use and the rents, issues, and profits of said island during the period so used by him is the sum of $750, and there is due from said John F. More to said estate for the use of said island said sum of $750"; and as a conclusion of law: "That he should further charge himself with the sum of $750, being the rent for the island Mescalitan during the period of his administration to date."

This finding is complained of as not justified by the evidence, "in that the evidence shows that the rental value of said Mescalitan during said period was less than $750, and not to exceed $150."

There were about 60 acres in the island of Mescalitan and about 300 acres of tidelands surrounding it which were valuable for pasturage. And it was proved, without contradiction, that the rental value of the island proper per annum, during all the times named, was at least $4 per acre, and that in 1894 the use of the tidelands surrounding the island was very valuable, worth perhaps $300 or $400, and in any year worth $50. Obviously, this evidence was quite sufficient to justify the finding.

3. The account presented for settlement contained three items for sums of money, aggregating $3,000 claimed to have been paid by the administrator to P. W. Watson, as monthly wages, at the rate of $125 per month, for his services as bookkeeper for the estate. The court rejected each of the items, and held that Watson had rendered no services for which the estate was liable, and that "the administrator should not be allowed anything on account thereof."

It is claimed for appellant that this decision was not justified by the evidence; that, on the contrary, it appears from the evidence that the estate was one of great value, and many important transactions required the services of an expert accountant

and bookkeeper; and hence "that the court erred in not allowing a reasonable amount to the administrator for the services of Mr. Watson."

It is true it cannot be said that in no case should an administrator be allowed to employ a bookkeeper. But whether an administrator should be allowed for payments made for the services of a bookkeeper depends upon the circumstances of the estate, and is a matter properly left to the discretion of the probate judge. "If the services were such as, under the circumstances, the administrator ought to have performed, and for which his commissions are intended to compensate him, such charge should be disallowed." (*In re Moore*, 72 Cal. 335.)

4. Appellant calls attention to four rulings of the court and claims that each one of them was erroneous. They were as follows:

1. Mr. C. E. Sherman was appointed by the court to count and report the number of sheep on the island. He undertook the work, and in making the count used a registering machine to check off the numbers. He testified that the machine worked correctly, and that he had used it for three or four years and never found any mistake in it; that he had not then the machine which he used in counting the sheep—having made a present of it to a gentleman at Bakersfield—but had one just like it, which he exhibited and pointed out the way it worked. Counsel for appellant then stated: "We would like this machine," and that they expected to show, and were advised they could show, "that these machines are entirely unreliable."

The Court.—"This is not the machine that he used."

Mr. Mhoon.—"We will strike out the subject of the machine. . . . . I will withdraw it."

The Court.—"It is withdrawn. Whatever way you made it, you made it count and the count was correct?" Witness.— "Yes, sir. I made a correct one."

Mr. Whitworth.—"We note an exception to the withdrawing of that testimony at this stage of the case."

2. The same witness, Sherman, was asked: "What is the average percentage of the increase of lambs of a flock of 40,000, in the spring, for instance?"

The question was objected to, upon the ground that the wit-

ness was not shown to be an expert on the question, and the objection was overruled. The witness had testified that he had been dealing with sheep about twenty-six years, and that he was familiar with the sheep husbandry.

3. It appeared that during the time Watson was employed by appellant as bookkeeper for the estate, and was receiving $125 per month for his services, he made out a claim against the estate for $30,000 for services claimed to have been rendered by him to decedent in his lifetime. One of the items of this claim was as follows: "July 5 to Sept. 8, 1893. Advising him not to purchase two million pounds of wool, in which matter he was very anxious to speculate and hold the same for a rise in the market, in which there would have been a heavy loss; also not to purchase five thousand tons of wheat, in which he was also anxious to speculate—eighteen thousand dollars."

It was admitted that the said claim was presented for allowance and rejected, and that suit upon it was thereafter brought by Watson and was then pending in court and being defended by the administrator.

Appellant was examined as a witness quite fully as to the relations that existed between Watson and A. P. More in his lifetime, and also in regard to the services of Watson as bookkeeper for the estate; and in connection therewith the said claim for $30,000 was offered in evidence by the contestants, and, over the objection of appellant that it was entirely immaterial and irrelevant, it was admitted.

4. While Mr. Sherman was making the count of the sheep in the fall of 1894, he left the island and was taken over in a schooner to Santa Barbara, with the understanding that he was to be sent for and brought back in a few days. Appellant testified that the schooner was sent over to the mainland about a week after Sherman left. "I told the captain to see Mr. Sherman and see if he wanted to come over. Some remark of that kind I said to Captain Thompson."

"Q. Did the captain bring back any word from him at that time? A. Yes, he did; the captain said he reported at Mr. Sherman's shop or business, I disremember which, in Santa Barbara; they told him there he was out of town at Lompoc, that was the word he brought back, and would be gone several days."

On motion of counsel for contestants this answer was stricken out upon the ground that it was simply hearsay.

We see no prejudicial error in the ruling complained of as to the registering machine. Counsel say: "The court erred in allowing the contestants to withdraw the register used by the witness Sherman in making the count, and in refusing to compel him to produce it." The administrator desired to inspect the machine that the witness had used in making the count, and to exhibit it to others for the purpose of showing that it was "entirely unreliable." But the witness did not have the registering machine that he used in making the count, and could not produce it, as was clearly shown. And no point seems to be made on the refusal of the court to require the duplicate machine which the witness then had to be handed over for inspection. Besides, there was evidence, aside from that given by Sherman, sufficient to justify a finding that the whole number was not greater than the number found by the court. And, if the count was in fact correct, then the case should not be reversed because the duplicate machine which was there was allowed to be withdrawn and not handed over for inspection, even if it ought to have been.

The question whether Sherman was an expert, and as such competent to testify as to what would probably be the average increase of lambs in a flock of 40,000 sheep in the spring of the year, was for the court to decide in view of the evidence, and the uncontradicted evidence that he had been in the sheep business for twenty-six years and was familiar with sheep husbandry would seem sufficient to justify the court in deciding the question as it did.

The time during which appellant claimed to have paid Watson for his services as bookkeeper for the estate covered the whole period between his appointment as administrator and the making out of his second annual account, and the $30,000 claim of Watson against the estate was evidently offered in evidence for the purpose of showing that one who would make out and present such a claim could not have been honestly and properly employed by appellant in the interest of the estate. But conceding that the claim was obnoxious to all the objections urged against it by respondents, still we fail to see how it was relevant

to the question whether all the services rendered by Watson as bookkeeper were such as under the circumstances the administrator ought to have performed, and for which his commissions were intended to compensate him. We think, therefore, that the court erred in admitting the said claim in evidence.

The answer of appellant as to the report brought back by the captain was not responsive to the question propounded to him and was clearly hearsay, and on that ground properly stricken out.

5. Finally it is said : "Whatever may be the evidence as to the number of sheep at the time of the expiration of the lease, the court erred in charging the administrator with the value of the deficiency in number. If, upon a final accounting, it should be found that the administrator is unable to turn over to those entitled to the same the number of sheep which ought to be turned over, it will be time enough then to charge him with the value thereof. The court cannot, during the course of the administration, and before the time when he should turn over the specific property to those entitled to the same, charge the administrator with the value of any property supposed to have been lost or destroyed through the fault of the administrator."

No authority is cited in support of this proposition, and we know of no rule of law or public policy which can be said to sustain it. Appellant was obligated, as lessee of the island, to turn over to himself, as administrator, on the first day of October, 1894, 40,000 head of sheep. This, it appears, he failed to do, but about a year and a half later falsely reported to the court that, as administrator, he had that number of sheep on hand and the increase thereof.

From the date of the expiration of the lease the estate was entitled to the full number of sheep named, and all the increase thereof, and all the wool clipped from the whole band, and if it be true that appellant cannot be charged with the value of the deficiency in the number turned over until all litigation in regard to the estate has been ended, and he has presented his final account for settlement and is ready to turn over all the property to the heirs, then it is apparent that the matter may possibly be delayed for many years and until important witnesses in the case are dead, and that the heirs might thereby be deprived of valu-

able property to which they were entitled. We conclude, therefore, that the court was authorized to hear and determine the matter, as it did, on the settlement of the second annual account.

We advise that the judgment or order appealed from be reversed in so far as it relates to the three items embraced in the account for moneys claimed to have been paid to Watson for his services as bookkeeper, and that the administrator be permitted to include the said items in his next annual account for further consideration by the court below, and that in all other respects the said judgment or order be affirmed.

Chipman, C., and Britt, C., concurred.

For the reasons given in the foregoing opinion the judgment or order appealed from is reversed in so far as it relates to the three items embraced in the account for moneys claimed to have been paid to Watson for his services as bookkeeper, and that the administrator be permitted to include the said items in his next annual account for further consideration by the court below, and that in all other respects the said judgment or order is affirmed.

Henshaw, J., Temple, J., McFarland, J.

Hearing in Bank denied.