ALBERT A. SMITH AND J. ELDREDGE SMITH, APPELLANTS, v. WILLIAM RAHAS, RESPONDENT.

No. 3987

November 29, 1957

318 P.2d 655

*Grant Sawyer,* of Elko, for Appellants.

*Williams and Mann,* of Elko, for Respondent.

## OPINION

By the Court, BADT, C. J.:

This is an appeal from a judgment rendered in favor of defendant, respondent here, on his counterclaim for

damages for loss of cattle, which cattle, together with their home ranch and certain grazing privileges had been leased by respondent to the appellants. The court below in its findings of fact determined that the loss of the cattle had been due to circumstances beyond the control of the appellants as lessees and was not due to their negligence. On this appeal appellants contend that these facts, so found, relieve them of liability for the loss; that their covenant "to return to the lessor at. the expiration of this lease the said leased livestock" added nothing to their common law liability; that the lease constituted them bailees of the cattle and that as such they are liable only for losses due to their negligence or lack of care.

The trial court in rendering judgment in favor of respondent, notwithstanding lack of negligence on the part of appellants, appears to have been influenced by the construction of the lease which the parties themselves placed upon it, and particularly upon three of its major provisions. In these respects it found the lease ambiguous, against appellants' contention that its terms are clear and not subject to construction.

As the words used in the written lease and as discussed by the parties and by the court are of major importance, we have found it necessary to emphasize the same by frequent use of italics. All such emphasis, including emphasis of words within quotation marks, has been supplied.

The lease in question granted, demised and let to the lessees certain ranch property, together with water rights and appurtenances, forest reserve privileges, farming machinery and horses and also the following cattle: 84 steers, 32 heifers, 9 cows, 4 bulls, 136 cows and 59 calves, aggregating a total of 324 head, subject to count and revision October 31, 1950. The term of the lease was from June 27, 1950 to October 31, 1953. The lessees agreed to occupy, till and cultivate the premises in farmer-like manner and according to the usual course of farming practices in the neighborhood; *to deliver to the lessor one half of the hay crops, to be divided on the premises.* It was further provided: "It is also agreed

that as part of the rental, the lessees will deliver to the lessor one half *of the increase* of said cattle. It is agreed that the lessor shall have the sole right of sale or the disposition *of the increase* of said livestock, and the proceeds *thereof* shall be divided one half to the lessees * * *. The lessees further *agree to return to the lessor,* at the expiration of this lease, the said leased livestock and all hay left on said premises; lessor, however, agrees to pay to the lessees the expense of harvesting said hay; it not being the intention of the parties that said livestock be returned *in the same classifications* as delivered to lessees, as such requirement would be impractical and impossible by virtue of the limited period hereof."

Some disputes arose between the parties, and the premises and livestock were surrendered to the lessor in December 1952. The lessees sued for one half of the value of the *turn-off* sold in 1952 and one half of the value of the hay on the premises. The lessor counterclaimed for a shortage of 55 head of the cattle returned. The court found that the lessees, plaintiffs, were entitled to judgment for one half of the proceeds of sale of *turn-off* for 1952 and one half of the value of the hay harvest in 1952, and that the lessor, defendant and counterclaimant, was entitled to judgment for the reasonable value of the shortage of 55 head of cattle returned. This left a balance of some $2,757 in favor of defendant and counterclaimant.

The cause of the loss is clear. The court noted in its decision: "[D]uring the winter of 1951-52 there were snow and wind storms of unprecedented violence which the stockmen could not be expected to have foreseen and guarded against. The lessees made every human effort to get feed to the cattle, but were prevented by an act of God." This was carried forward into the court's formal findings of fact.

The litigation was initiated by the complaint of the lessees alleging the execution of a lease from Rahas to the Smiths dated June 27, 1950 of the ranch properties together with implements, tools, machinery, equipment and horses, together with 324 head of cattle for the period from June 27, 1950 to October 31, 1953, with the

lessees *to pay as rental to the lessor one half of the proceeds of hay,* pasture and crops, together with one half *of the increase* of said cattle—defendant having the sole right of sale or disposition *of the increase;* that on November 15, 1952 (approximately one year prior to the termination of the lease) Rahas requested the Smiths voluntarily to surrender the lease so that he might make a sale of the premises and promised the Smiths "that he would settle with them for their proper *share of hay produced* during the year 1952 and their proper share *of increase* sold; that the Smiths, acting on this promise, surrendered their rights under the lease; that Rahas sold the increase for $11,497; that the Smiths had produced 258 tons of hay of a reasonable value of $6,450. They prayed judgment for $8,973, one half of the total of these sums. Defendant in answer alleged the voluntary abandonment of the premises by the plaintiffs, denied the return of the livestock and denied his liability for the payments demanded. As a counterclaim he alleged the loss by plaintiffs of a large number of livestock and demanded judgment for their reasonable value. He attached a copy of the lease as an exhibit. In answer to the counterclaim the Smiths admitted the execution of the written lease and the delivery of the livestock in the numbers and classifications as alleged, admitted that they moved off the premises on or about December 4, 1952, but denied the allegations of the shortages of livestock. They further pleaded that the counterclaim failed to state a claim on which relief could be granted. They did not specifically plead that the losses, if any, were due to act of God.

A pretrial conference was had, followed by a trial in which the parties and their witnesses were examined at length. Pursuant to the pretrial conference and development had during the trial the learned trial judge analyzed the situation as follows: "Plaintiff pleaded an express promise on the part of the defendant to pay one-half the value of the hay on the premises and one-half the proceeds of the 1952 fall turn-off sale if the plaintiff would abandon the ranch. The defendant has pleaded that the abnormal loss of cattle in the winter of 1951 and

'52 amounts to a breach of the covenant to operate the ranch in a farmer-like manner, and that this excused further performance by the defendant." The court then remarked:. "The determination of rights and liabilities of the parties to the agreement *who have ignored its provisions* is not an easy task." The court then referred to the covenant of the lessees *to deliver* half of the hay etc., whereas for over two years the entire crop of the hay harvested and stacked was used to feed the cattle during the winter. It referred to the covenant that the lessees would deliver to the lessor one half *of the increase* of said cattle, whereas half *of the increase* was never delivered to the lessor. It referred to the fact that the lessor did not sell *the increase* and divide the proceeds with the lessees but on the contrary sold what is known as the *turn-off* and that the proceeds of the 1950 and 1951 *turn-off* were divided with the lessees. (Annual "turn-off" in the operation of a herd of stock cattle, under the custom followed by the Rahas ranch for many years, meant the sale of the two-year old steers and so many of the old cows and dry cows as it seemed advisable to sell to preserve a properly balanced herd.) So impressed was the trial court with the uncertainties of the situation as provided for in the lease that he remarked in his decision, "the lease in this case sets a new standard for ambiguity". It followed this up with the following: "Yet the parties, themselves, by a consistent course of conduct for over two years have placed a practical construction on it which defines their rights and fixes their responsibilities." The court then applied the rule giving great, if not controlling, effect to the interpretation placed upon the contract by the parties themselves when determining the meaning of an indefinite or ambiguous contract. Flyge v. Flynn, 63 Nev. 201, 166 P.2d 539. It held that under the doctrine of practical interpretation the contract, in three of its most essential covenants, was not as recited in the written instrument but on the contrary was construed, interpreted, agreed and acted upon by the parties in an entirely different manner. Two of these we have discussed. The third is the crux of this appeal. Instead of applying to the covenant "to return to the

lessor, at the expiration of this lease, the said livestock" the common law rule of the law of bailment and agistment, which would exclude liability for losses arising other than from negligence or lack of reasonable or ordinary care, the covenant to return was held to be a covenant to return the numbers of the leased livestock at all events.

We held in Bramlette v. Titus, 70 Nev. 305, 267 P.2d 620, that under the type of bailment deemed an agistment the agister is bound to take reasonable or ordinary care of the animals committed to his charge and is liable in event of loss only for his negligence or want of ordinary care, and that where the evidence shows that the cattle were lost through no fault of the agister, the owner cannot recover on the contract of bailment or agistment. We may add to this what seems to be a well accepted rule "that a mere promise of the bailee to return the bailed property * * * imposes no greater liability upon the bailee than the implied promise involved in every contract of bailment." See annotation 150 A.L.R. 271 and cases cited and reviewed in Fuchs v. Goe, 62 Wyo. 134, 163 P.2d 783, 166 A.L.R. 1329. It is, however, just as generally held that the liability of the bailee may be enlarged by special covenant. See In re More's Estate, 121 Cal. 609, 54 P. 97, 98, in which the lessee agreed that the leased flock of sheep "shall be grown up to 40,000 head of sheep, and that the said lessees shall, at the end of said term, turn over and deliver to said lessor * * * that number, to wit, 40,000 head of sheep * * *."

In its action thus recited it is clear that the court in effect reformed the instrument in respect to the foregoing three items. There is nothing ambiguous in the clause providing for a division of the hay. It was simply not the real agreement of the parties. The real agreement was to feed the hay to the cattle to carry them through the winter, with, possibly, division of a surplus. There was nothing ambiguous in the clause of the written agreement agreeing to a division of the increase. The real agreement of the parties was simply that the

lessor should sell the turn-off and divide the proceeds. There was nothing ambiguous in the covenant to return the cattle at the end of the lease under the construction of such clause as almost uniformly applied by the courts. The court simply held that the real agreement of the parties was to return such numbers of cattle *at all events,* that is to say, even though a loss or shortage was not the result of negligence or lack of reasonable care or husbandry on the part of the lessees.

It seems clear to us, therefore, that the court did not in effect resolve ambiguous clauses but, despite the fact that it made no formal decree of reformation, reformed the contract to provide what it decided was the real agreement of the parties.

That it had the right thus to reform the agreement even in the absence of a prayer to such effect seems fully supported by Rule 54(c) NRCP, which reads in part: "* * * Every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings."

In Metropolitan Casualty Ins. Co. v. Friedley, 79 F. Supp. 978, 982, the court specifically applied this rule, although the party did not specifically request reformation. The simple pleading and proof of facts justifying reformation was held sufficient to grant such relief. It referred to the holdings of the majority of jurisdictions that where the pleadings and evidence warrant reformation the court may in its discretion give effect *to the intended contract* and enforce it as if it were reformed without any formal decree of reformation. See the cases cited in the opinion. See also 45 Am.Jur. 588, Reformation of Instruments, secs. 10 and 11, reciting the rule in jurisdictions under the reformed procedure, or in jurisdictions in which the distinctions between law and equity are abolished, or in which both forms of relief are administered by the same court, (all of which conditions exist in this state), in an action at law upon an instrument, the court may in a proper case construe the

contract as it was intended by the parties and render a proper judgment on the basis thereof, just as if there had been first a reformation of the contract.

It should first be noted that the suggestion of such relief appeared first in the plaintiffs' complaint where they pleaded the legal effect as a provision to pay, as rent, one half *of the increase* of the cattle but prayed for judgment for one half *of the value of the cattle sold.* And although plaintiffs alleged the operation of the ranch by them for two years (during both of which years the hay crop was fed to the cattle over the winter season and presumably would have to be fed in the approaching winter season of the current year), they also sought judgment for half the value of the hay on the premises. The court in effect reformed the contract in these two respects in accordance with the contention of plaintiffs, and awarded them judgment for half of the value of the hay crop on the premises and half of the proceeds of the sale of the cattle turn-off. The lessor did not appeal from this part of the judgment. Despite the absence of appeal from the judgment which in effect reformed the contract in these two respects, we may say that it is amply supported by the record.

Likewise, in holding the appellant lessees liable to account for the total amount of cattle, the court held that "to hold otherwise would do violence to the provision of the lease *and ignore its practical construction by the parties.*" As above noted, we have held that this was likewise in effect a reformation of this provision of the contract rather than the interpretation of an ambiguous provision. We approach then what appears to be the main question—as to whether the reformation in this particular is justified.

When plaintiff J. Eldredge Smith was asked at the beginning of plaintiffs' case, "What, if any financial arrangement was made between you and Mr. Rahas as to the loss of these cattle, the financial loss to the parties of the lease" and an objection was made on the ground that it was irrelevant, *plaintiffs'* counsel stated: "Your Honor, just on the theory that *the actions of the parties under the terms of the lease would appear to me to be*

*an interpretation of their understanding of the lease.*
Now, there is no loss clause in this lease, and their
actions in connection with losses for the period of time
that the lease ran, prior to its termination, it would
appear to me *would be relevant in connection with their
understanding as to the losses.*"

After the losses of the winter of 1951-1952 Mr. Smith
was summoned to a meeting with the attorney for Mr.
Rahas and related the following conversation: "A. Mr.
Robbins said it was futile to stay on the ranch, that I
couldn't expect to have any returns from the turn-off
of the '52 crop sales. Q. And did you have any plans
as to how you were going to make up these losses?
A. Well, I could have taken the money that I got out
of that cut and bought more cattle and replaced them.
Q. Could have replaced the total amount? A. Well,
I think I could have later; maybe not at that particular
time, but I think if I had been given a chance I could
have. Q. When you say if you had a chance; how long
a time did you want to replace those cattle? A. I think
I could have probably replaced them by the termination
of the lease. Q. And if you had gotten half of the sale
of these cattle, that would have been around five thou-
sand dollars? A. That is right."

The first cattle sales made from the herd after the
lease was entered into June 27, 1950 were in the fall
of that year. The two-year old steers and some old cows
were sold and of the proceeds of some $9,000 the lessees
were given one half. At that time the lessees had been
operating the premises for less than four months. The
stock thus sold must have been raised through at least
more than two years of operation in which the lessees
could have had practically no part.

Smith was called as an adverse witness and the fol-
lowing occurred: "Now, referring to this lease, was it
your testimony yesterday that it was your understand-
ing that as of the normal termination of the lease, if it
had been carried through, that you would have had to
return 258 or 259 head of cattle to Mr. Rahas? A. That
is right. * * * Q. Well, now, I am just asking you
the question: did you believe that you would receive

half of the increase in the fall of 1952, if there had been an increase? A. Well, I knew that we had sustained a loss and I didn't know just how we were going to work out the arrangement." Later he was asked, "Was it your interpretation of the lease that you would return the same number of cattle that you had taken over? A. That is right." The court later took the examination in hand and after determining by his questions the number of cattle on hand after the fall count and after the fall sales of 1950, asked, "The herd, then, would be 267; you felt that you should return that many. A. Yes, sir."

Nowhere in the pleadings or in the testimony of the Smiths or in the statements of their counsel can be found any contention that no liability arose by reason of the unprecedented snow and winds of the winter of 1951-1952, or, otherwise put, that the losses were due to an act of God. The only reference to such element occurs at one point when the Smiths offered in evidence photographs of conditions existing March 26, 1952. The following then occurred: "Mr. Mann: Your Honor, I would object on the ground that they are irrelevant; also there has been some testimony admitted as to the conditions up there, over objection. I don't think the pictures add anything to it, but, as I see it, they are evidently offered to show some excuse or some reason for the cows dying during that winter, and it is our contention that such has not been [pleaded]. The Court: You certainly don't claim that you haven't had notice; we have had the pre-trial conference and it was discussed yesterday. Mr. Mann: It hasn't been [pleaded]; it is beyond the issues formed; it is not a defense to the loss of cattle as set up in our counter-claim and it is outside the order of proof. The Court: the objection is overruled. They may be admitted in evidence."

There are no minutes of the pretrial conference. The court at the beginning of the trial referred to the pre-trial conference and alluded to nine separate items having to do with (1) the admission of the lease, (2) the count of the cattle October 31, 1950, (3) the count when

the lessees left the premises, (4) the hay tonnage, (5) the sale price of the October, 1952 turn-off, (6) certain damage to the barn, (7) the letter to J. Eldredge Smith by John E. Robbins, attorney for Rahas. As No. 8 the court stated, "The pleadings of the parties are in order and there is no necessity of amendments * * *." No. 9 had to do with the admission of photographs, to which objection was reserved. If there is an inference that the court's remark last above quoted, when the photographs were offered, that the pretrial conference indicated a reliance by the lessees on the assertion that the shortage in the cattle resulted from an act of God, we certainly do not find it in the items of the pretrial conference noted by the court. Quite obviously those items were recited from the presiding judge's notes. The court's notation that the pleadings were in order without necessity for amendment can more reasonably be said to indicate that such defense was not discussed.

The importance of applying the rule of interpretation by the parties was emphasized by this court in Flyge v. Flynn, 63 Nev. 201, 209, 166 P.2d 539, because they are far less likely to be mistaken when they are in harmony and before they have had to resort to law. It would seem to apply a fortiori where, as here, Smith's interpretation of his liability to return the leased cattle, even though lost through act of God, was given both before and during the trial of the action.

We conclude that the court's judgment against the plaintiffs on defendant's counterclaim for failure to return the leased livestock, based upon what was in effect a reformation of the covenant to return, finds ample support in the record. The court in effect held that the parties themselves interpreted the covenant to mean that the lessees were to make up the losses occurring from any cause. The court's conclusion of liability necessarily implies a finding that this was the understanding of both parties that such was their agreement. The covenant was, therefore, an enlargement of the

liability of the lessees beyond their common law liability limited to losses due to a lack of ordinary care.

The judgment is affirmed with costs.

EATHER and MERRILL, JJ., concur.