452 P.2d 981

**Reuben C. NAB, dba Aluma Sales Co.,
Plaintiff-Appellant,**

v.

**Raymond HILLS and Joanne Hills, husband
and wife, and William P. Hills and Bessie
C. Hills, husband and wife, Defendants-
Respondents.**

No. 10125.

Supreme Court of Idaho.

April 7, 1969.

Schwartz & Doerr, Twin Falls, for plaintiff-appellant.

Rayborn, Rayborn, Webb & Pike, Twin Falls, for defendants-respondents.

DONALDSON, Justice.

Plaintiff (appellant) Reuben C. Nab, dba Aluma Sales Co., brought this action against defendants (respondents) William and Bessie Hills, husband and wife, and Raymond and Joanne Hills, husband and wife, to foreclose a materialman's lien on the following described real property:

"Southeast Quarter (SE ¼) of Section Nine (9), Township Nine (9), Range Seventeen (17) East of Boise Meridian, Jerome County, Idaho." (Pl. Ex. F.).

William and Bessie Hills were record owners of the property, and Raymond and Joanne Hills had an equitable interest therein under a contract for the sale of the property. Unless otherwise specified, the name Hills as used in this opinion refers to Raymond and Joanne Hills. Defendants denied the allegations of the complaint, raised the affirmative defense of fraud, and counterclaimed in the alternative for damages. Apparently at trial the counterclaim for monetary damages was abandoned.

The case was heard before an advisory jury, to whom the trial court put written interrogatories. Based upon the answers to the interrogatories the court made findings of fact, conclusions of law and judgment, dismissing plaintiff's complaint and decreeing entry of judgment in favor of defendants.

Evidence adduced at trial showed that Raymond and Joanne entered into a contract with Raymond's parents, William and Bessie, to purchase the property in question, a farm located in Jerome County. The younger Hills resided in the house (an old, wood-frame dwelling) located on the property. Early in 1966, Joanne sent a card of inquiry to the Reynolds Metals Company, whose general office is located in Richmond, Virginia, for the purpose of obtaining information concerning aluminum construction materials. Raymond was to be transferred by his employer to another area in Idaho; he and his wife intended to build a house in the new location. It appears from the record that before trial but after the events involved in this litigation they

did move from Jerome County to Buhl, in Twin Falls County.

February 22, 1966, Raymond received a telephone call from a Mr. Cocotis, representing himself as an employee of Aluma Sales Company. Mr. Cocotis stated over the phone that he had received a card to the effect that the Hills were interested in aluminum products. An appointment was made for Mr. Cocotis to see the Hills the following evening. 7:00 P.M., February 23rd, Mr. Cocotis, in company with Gerald Patterson, arrived at the farm. Mr. Patterson,[1] according to Raymond and Joanne, described himself as an advertising man employed by Reynolds Metals. He carried a brief case which bore on its side the distinctive emblem of the Reynolds Company.

In fact Patterson was not employed by Reynolds, but worked on a commission basis as a salesman for Aluma. Aluma was a sales outfit wholly owned by plaintiff Reuben Nab. Aluma held a franchise from another company located in Salt Lake City to distribute Reynolds products in the South-central Idaho area. The Salt Lake City company in turn had a franchise agreement with Reynolds to distribute the products throughout the Pacific Northwest. Whether the Salt Lake City operation was a subsidiary of Reynolds cannot be determined from the record. At any rate, there is no reason to doubt that Patterson lied when he claimed to be an advertising employee of Reynolds Metals.

From the testimony of Raymond and Joanne, it appears that Mr. Patterson stated to them that he was in the Twin Falls area to set up a "model home" for the purpose of advertising Reynolds aluminum siding and other aluminum products. The Hills advised him that they did not wish to re-do the exterior of their home because of the impending move to another location. In answer to a question of Mr. Patterson, they also stated that they did not intend to sell the farm or the house. Mr. Patterson in turn asked them if they would be interested in having their house resided in aluminum at no cost, providing that Reynolds could use their house as a "model home." Allegedly the house was in a suitable location for advertising purposes and was of a type of construction which would lend itself well to "before" and "after" photographs. Patterson also told the Hills that Reynolds would make up 50,000 advertising brochures using photos of the farm house. In addition Patterson stated that the Hills would not have to do any promotional work, but need only make their house available for the advertising and demonstration needs of Reynolds. Joanne and Raymond expressed interest in this proposition.

Later that evening Mr. Patterson, Raymond and Joanne worked out plans as to exactly how the house would be re-structured. The cost of remodeling was estimated by Patterson to be $2,450.00. This cost was to be carried on Reynolds' books as advertising expense. According to the Hills, they were to be paid by Reynolds 7% (up to $250.00) of each re-siding job sold in the Twin Falls area through the use of their home. All checks up to $2,450.00 from Reynolds to the Hills were to be re-endorsed over to Reynolds. Thereafter the Hills were to retain the 7% commission as

---

1. By the time of trial Mr. Patterson had departed for points unknown and was unavailable as a witness. A deposition taken from him prior to trial was introduced in evidence by publication. No record of the deposition appears in the transcript for the reason that the court reporter assisted in reading the deposition to the jury; nor was the deposition made an exhibit. However, the original of the deposition later was transmitted to this court. Since the jury actually heard the deposition and since there is no contention that the document sent to the court was not the one heard by the jury, we deem it in the interests of justice to augment the record by its inclusion therein. Supreme Court Rules, Rule 37. At trial respondent objected to use of the deposition because it had not been signed by the witness, Patterson. I.R.C.P., Rule 30(e). The deposition was filed nearly six months prior to trial. Failure to make a timely motion to suppress acted as a waiver of the irregularity. I.R.C.P., Rule 32(d).

consideration for the use of their house. Under no circumstances were the Hills to be liable for the cost of the siding. A writing was drawn between the Hills and Aluma Sales Co. obligating the Hills to pay Aluma the sum of $2,450.00 plus service charges of $274.40 at the rate of $55.25 per month for 60 months. Joanne and Raymond were told by Patterson that the writing was a mere formality so that Reynolds could properly deduct the sum as advertising expense from its corporate income tax. They were also informed that the instrument made Aluma a party rather than Reynolds because Aluma was Reynolds' franchised dealer in South-central Idaho and because Aluma would be doing the actual work on the house.

Appellant testified that the agreement was as stated in the writing. In addition, for every person who, as a result of a referral by the Hills, purchased aluminum siding from Nab, the Hills were to receive a commission equalling 7% of the price of such purchase or $200.00, whichever happened to be less. It is interesting to note that the referral sales agreement, which Nab contends existed, is directly contrary to the writing which is the basis of Nab's suit. One of the clauses therein states:

> "I/we hereby certify the following for the purpose of inducing the extension of credit: * * *
>
> 4. It has not been represented that I (we) will receive a cash bonus or commission on future sales as an inducement for the consummation of this transaction."

Thus by appellant's own testimony, it is demonstrable that the writing underlying his claim did not truly express the agreement of the parties.

Appellant introduced into evidence, as the second page of the writing already referred to, the following instrument allegedly signed by the Hills:

"DO NOT SIGN WITHOUT READING!

"I, the undersigned home owner, understand clearly that:

1. I have signed a contract for home improvements dated 2/23/66; for $2450.00 and numbered _____.

2. My contract price is a cash price and does not include any carrying charges, insurance, etc., for long term financing.

3. My monthly payments, if desired and approved, will include all finance charges, etc.

4. If my contract calls for bills to be paid for me, they will be paid when job is completed and papers processed but at least 30 days before first payment is due on the contract.

5. If I am to participate in finder's fee for other jobs, I will furnish prospect's name and address in accordance with the finder's fee agreement, but I am not required to do any selling.

6. I can use earned finder's fee in whatever way I please and they have nothing to do with my monthly payments.

7. There has been no agreement, written or verbal which in any way disagrees with or alters the written contract I have signed, the work specified in it, or this statement.

| | X /s/ Raymond Hills |
|---|---|
| Witness | Owner |
| | X /s/ Joanne Hills |
| | Owner |

DO NOT SIGN WITHOUT READING"

The Hills denied ever signing the instrument, and contended that their signatures were forged thereon. The evidence, which will not be cited herein is persuasive that the signatures were a forgery.

Raymond Hills testified that he and his wife did sign an instrument with the Reynolds Emblem and the heading "Model Home," printed on it, and containing provisions concerning the payment of commissions for the use of their home. He testified that neither he nor his wife received a copy of the writing, but rather Mr. Patterson retained all copies so that they might be

approved in Virginia by the Reynolds Board of Directors.

The next day Aluma delivered the materials for the job. Actual construction work was performed by an independent contractor employed by Aluma.

At some time during the rebuilding process, which took several weeks, Joanne and Raymond became aware that Aluma intended to hold them to the terms of the written instrument. There is conflicting evidence as to how far the job had progressed before they learned of this fact. Nevertheless, it is clear that they did not request Aluma to stop the construction process once the serpent of doubt had crept into the Eden of their minds. Rather they permitted the work to be finished.

Evidence was introduced to indicate a similar course of dealing between Aluma and other persons in the Twin Falls area.

It is uncontroverted that the Hills paid no part of the money due under the written instrument. Likewise it has not been urged that the work done on the house was in any manner faulty. It does appear, however, that the Hills' house never has been used for advertising purposes by Reynolds or by Aluma, although it was continuously available for such use.

Based on interrogatories given the jury and their answers thereto,[2] the court enter-

---

2.     "INTERROGATORY NO. 1

"In the conversations between the defendants Hills and the agents or representatives of the plaintiff on the 23rd day of February, 1966, did the plaintiff's agents or representatives make any false statements?

Yes

"INTERROGATORY NO. 2

"If your answer to Interrogatory No. 1 is yes, please set out such statement or statements in longhand on this interrogatory.

1. That Mr. Patterson was a representative of Reynolds.
2. Mr. Patterson told the Hills' they had a model home.
3. That there would be before and after pictures taken of the Hill's home printed on 50,000 brochures.
4. Mr. Patterson called the signing of the contract 'a mere formality' for Reynolds' advertising tax write-offs.

"INTERROGATORY NO. 3

"If your answer to Interrogatory No. 1 is yes, were any of the false statements made by the agents or representatives of the plaintiff material to the inducement of the contract in question in this action? That is, were they material to the thinking processes of the defendants in entering into the contract.

Yes

"INTERROGATORY NO. 4

"If your answer to Interrogatory No. 1 is yes, were the defendants at the time the false statement was made aware of the fact that the statement was false?

No

"INTERROGATORY NO. 5

"If your answer to Interrogatory No. 1 is yes, was it the intent of the agent or representative of the plaintiff at the time the statement was made that the statement should be acted upon by the defendants by entering into the contract in question in this case?

Yes

"INTERROGATORY NO. 6

"If your answer to Interrogatory No. 1 is yes, when the false statement was made by the agent or representative of the plaintiff was the agent or representative of the plaintiff who made the statement aware that the statement was false?

Yes

"INTERROGATORY NO. 7

"If your answer to Interrogatory No. 1 is yes, did the defendants rely upon the false statement made by the agent or representative of the plaintiff in entering into the contract in question in this case?

Yes

"INTERROGATORY NO. 8

"If your answer to Interrogatory No. 1 is yes, did the defendants in entering into the contract in question in this case have a right to rely upon the false statement made by the agent or representative of the plaintiff?

Yes

"INTERROGATORY NO. 9

"If your answer to Interrogatory No. 1 is yes, were any of the false statements made by the agent or representative of the plaintiff concerned with past or existing matters?

Yes

"INTERROGATORY NO. 10

"If your answer to Interrogatory No. 1 is yes, were any false statements made by the agent or representative of the plain-

ed findings of fact, conclusions of law, and judgment dismissing the action to foreclose the lien. Supplementary to the findings of the jury, the court found as fact:

### "XIII

"The defendants were damaged by the material misrepresentations of fact by the agent and representative of the plaintiff, Gerald Patterson.

### "XIV

"In addition to other damages sustained by the defendants through the material misrepresentations of fact here specified, they entered into an instrument of contract obligating them to pay $2,450.00 which contract they would not have entered into but for the false statements of the agent and representative of the plaintiff. They substantially changed their position through the false statements of the said agent and representative.

### "XV

"Restoration of performance by the plaintiff in this case was impossible because of the fact that the siding was cut and installed to order upon the property of the defendants with substantial changes in the physical situation of the defendants' property, thus rendering a tender of return of such consideration useless."

■ Before we discuss the assignments of error, we must observe that the type of sales referral scheme which appellant attempted to prove at trial has been held by a number of jurisdictions to constitute an illegal lottery. Such "illegal lotteries" are considered void as against public policy. See, M. Lippincott Mortgage Investment Co. v. Childress, 204 So.2d 919 (Fla.Dist. Ct.App.1967); Commonwealth v. Allen, 404 S.W.2d 464 (Ky.1966); State by Lefkowitz v. ITM, Inc., 52 Misc.2d 39, 275

N.Y.S.2d 303 (Sup.Ct.1966); Sherwood & Roberts-Yakima, Inc. v. Leach, 67 Wash.2d 630, 409 P.2d 160, 14 A.L.R.3d 1411 (1965); cf., Idaho Const., art. 3, § 20; I.C. §§ 18–4901—18–4909; see generally, Annot., 14 A.L.R.3d 1420 (1967); Baird, Let the "Seller" Beware—Another Approach to the Referral Sales Scheme, XXII U.Miami L.Rev. 861 (1968); Comment, Referral Sales Contracts: To Alter or Abolish?, 15 Buffalo L.Rev. 699 (1966); Note, Criminal Aspects of Chain Referral Sales, II Suffolk U.L. Rev. 93 (1968). This court undoubtedly has the power to raise the questions of illegality and public policy *sua sponte*. See Stearns v. Williams, 72 Idaho 276, 240 P.2d 833 (1952). Nevertheless our resolution of the issues on appeal, *infra,* make it unnecessary to determine the legality of a chain referral sales contract.

■ Turning now to the alleged errors, it is avered that "The Court erred in failing to submit interrogatories to the jury covering all the material elements of fraud in that the jury, acting in an advisory capacity, failed to find that defendants-respondents were in any way damaged." The assignment of error is without merit. I.R.C.P., Rules 39(c), 49(a); Milligan v. Continental Life & Accident Co., 91 Idaho 191, 418 P.2d 554 (1966). Also the trial judge did make a finding of fact that the defendants-respondents were damaged. See Finding of Fact XIII, *supra.*

■ Appellant maintains that the court erred in entering judgment dismissing his complaint. Conceptually, the effect of the judgment was to reform the written instrument to conform with the agreement of the parties, and to find under the actual agreement that appellant was entitled to no recovery. The true agreement contemplated that the Hills were to receive gratis a remodeling of the exterior of their dwelling in return for making their home available for advertising purposes. The evidence shows the remodeling to have been

tiff concerned with future events to be performed by the plaintiff, his agents or representatives, which were never intend-

ed to be performed by the plaintiff, his agents or representatives?
Yes"

effectuated. Likewise there is no evidence that the Hills did not allow their house to be used for advertising. Consequently appellant has no claim on which to base relief.

■ "When fraud induces a variance between a written contract and the agreement between the parties, the latter will prevail and the trial court is empowered to reform the written instrument to conform to the agreement." McKelvie v. Hackney, 58 Wash.2d 23, 360 P.2d 746 (1961); see Paurley v. Harris, 75 Idaho 112, 268 P.2d 351 (1954); Wollan v. McKay, 24 Idaho 691, 135 P. 832 (1913).

■ The elements of fraud have been held to include:

"(1) A representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6) The hearer's ignorance of its falsity. ■ His reliance on its truth. (8) His right to rely thereon. (9) And his consequent and proximate injury."

Walker v. Nunnenkamp, 84 Idaho 485, 373 P.2d 559 (1962); accord, Callahan v. Wolfe, 88 Idaho 444, 400 P.2d 938 (1965).

■ We are satisfied that all nine elements of fraud have been shown to exist by the evidence produced at trial. Nevertheless, the ninth element, "injury," merits further discussion. Appellant would have us believe that it is necessary to prove actual pecuniary damage in order to establish fraud. Some Idaho cases have substituted the term "damage" in place of "injury." See, e. g., Shrives v. Talbot, 91 Idaho 338, 421 P.2d 133 (1966). We do not doubt that an action to recover monetary damage occasioned by fraud necessitates a showing of actual pecuniary damage, although what the proper measure of such damage may be, is open to question. Where, however, fraud is used defensively, or to support an action for rescission or reformation, proof of monetary damage is unnecessary. See Shrives v. Talbot, *supra*.

What must be demonstrated is damage or injury as those words are used in their broader sense.

■ As the Supreme Court of Montana stated:

"We prefer to adhere to the rule which gives to the term [damages] its broader significance, as including either pecuniary loss or *the alteration of one's position to his prejudice.* Fraud may result in injury which cannot be measured in dollars and cents * * *.

"If the allegations of this complaint are true, plaintiff was induced by fraudulent representations to assume obligations which otherwise he would not have assumed and to purchase property which otherwise he would not have purchased. We deem the allegations sufficient to disclose damage within the meaning of that term which we adopt." (Emphasis added).

Stillwell v. Rankin, 55 Mont. 130, 174 P. 186 (1918); accord, Holland Furnace Co. v. Rounds, 139 Mont. 75, 360 P.2d 412, 91 A.L.R.2d 340 (1961).

The fact that respondents did not specifically seek relief by way of reformation does not affect the disposition of this appeal.

"Demand for judgment.—A judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment. Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled even if the party has not demanded such relief in his pleadings." I.R.C.P. Rule 54(c).

■ Thus a party, who pleads and proves facts justifying reformation of a contract, is entitled thereto despite the absence of a prayer for such relief in the pleadings. Metropolitan Casualty Ins. Co. v. Friedley, 79 F.Supp. 978 (N.D.Iowa 1948); see Sutcliffe Storage & Warehouse Co. v. United States, 112 F.Supp. 590, 125 Ct.Cl. 297 (1953); Smith v. Rahas, 73 Nev.

301, 318 P.2d 655 (1957); I.R.C.P., Rule 15(b); see also, Fireside Marshmallow Co. v. Frank Quinlan Const. Co., 199 F.2d 511 (8th Cir. 1952). Likewise it was not reversible error for the court to give effect to the intended contract and treat it as if reformed without any formal decree of reformation. Metropolitan Casualty Ins. Co. v. Friedley, *supra;* Smith v. Rahas, *supra;* I.R.C.P., Rule 61; see Layrite Products Co. v. Lux, 91 Idaho 110, 416 P.2d 501 (1966).

■ Respondents' failure to tender back the aluminum siding did not destroy their right to reformation, since they were entitled to the property under the true agreement. Bowers v. Bennett, 30 Idaho 188, 164 P. 93 (1917). In this connection, the trial court made the following factual finding:

> "Restoration of performance by the plaintiff in this case was impossible because of the fact that the siding was cut and installed to order upon the property of the defendants with substantial changes in the physical situation of the defendants' property, thus rendering a tender of return of such consideration useless."

■ While it is probable that the trial court was in fact correct, unfortunately it does not appear from the record that any evidence was introduced to show that restoration was impossible. The error however was harmless, and did not constitute reversible error. I.R.C.P., Rule 61.

■ In any case, we believe that the necessity for restoration of benefits prior to maintaining an action or defense based on fraud is an outmoded concept, the effect of which is to further injure the innocent party. New York has solved the problem by enactment of the following:

"A party who has received benefits by reason of a transaction that is void or voidable because of fraud, misrepresentation, mistake, duress, infancy or incompetency, and who, in an action or by way of defense or counterclaim, seeks rescission, restitution, a declaration or judgment that such transaction is void, or other relief, whether formerly denominated legal or equitable, dependent upon a determination that such transaction was void or voidable, shall not be denied relief because of a failure to tender before judgment restoration of such benefits; but the court may make a tender of restoration a condition of its judgment, and may otherwise in its judgment so adjust the equities between the parties that unjust enrichment is avoided." C.P.L.R. § 3004.

As was stated in another connection by Justice Doyle of the Montana Supreme Court, the law today is inadequate to protect the unwary from high-pressure promoters who thrive on "legalized larceny." Frank J. Trunk & Son, Inc. v. DeHaan, 143 Mont. 442, 391 P.2d 353 (1964) (concurring opinion). Some steps have been taken recently toward reform, but much remains to be done before the public will be safe from the unscrupulous few.

Other assignments of error have been rendered moot by the views expressed herein, and will not be discussed. The judgment is affirmed.

Costs to respondents, except for the cost of preparing respondents' brief, which was not filed within the time limits of Supreme Court Rule 41.

McFADDEN, C. J., and McQUADE, SHEPARD, and SPEAR, JJ., concur.